Demchuk, Appellant, *v.* Bralow.

Argued November 18, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

re-argument refused July 14, 1961.

*John Michael Doodan,* for appellant.

*Thomas E. Comber, Jr.*, with him *John J. Runzer*, and *Pepper, Hamilton & Scheetz*, for appellee.

OPINION BY MR. JUSTICE BELL, May 22, 1961:

Plaintiff appeals from a judgment of nonsuit which was entered in her suit against defendant, a physician who was certified as specially qualified by the Board of Gastroenterology. In considering the entry or appeal from a nonsuit, the evidence and all reasonable inferences therefrom must be considered in the light most favorable to the plaintiff and a judgment should be entered only in a clear case. It is likewise hornbook law that a plaintiff must prove by a fair preponderance of the evidence that defendant was negligent and that his negligence was the proximate cause of the injury. Moreover, as we shall see, in malpractice cases we have pinpointed how a doctor's negligence must be proved.

President Judge CARROLL well summarized the facts: "The testimony of the plaintiff and her witnesses established that she entered the Kensington Hospital in Philadelphia on August 16, 1955, with a diagnosis of possible duodenal ulcer. Under the direction of the defendant various tests and X-rays were administered after which the diagnosis was modified to antral gastritis (inflammation of the stomach in the antral area). Accordingly, on August 23rd, in order to verify this diagnosis, the defendant performed a gastroscopic examination. This procedure consisted of the insertion of a semi-flexible tube approximately three feet in length and three-eighths of an inch in diameter with a soft rubber tip into the esophagus, the tube containing a light and lens periscope arrangement whereby a visual examination of the stomach could be made. [The path of the esophagus is not straight but is curved at the point of penetration.]

"Doctor Bralow testified on cross-examination that he twice attempted to pass the gastroscope into the plaintiff's stomach but was unsuccessful because of the resistance encountered. He attributed this resistance to *persistent cardiospasm** [and there was no evidence of any other reason or cause]. After the second attempt plaintiff complained of much pain in the upper quadrant and difficulty in breathing, causing him to suspect a perforation of the esophagus. Subsequently X-rays were taken and it was found that the gastroscope had caused a tear in the esophagus resulting in a leakage of air into the pleura space around the lungs and a partial collapse of the right lung. This condition necessitated emergency surgery to suture the damaged esophagus. The surgery consisted of an incision from the vertebra to the clavicular line and the removal of the seventh rib in order to reach the perforation and the insertion of some forty-one sutures to close the incision. Understandably, the plaintiff experienced severe pain in recuperating from this operation and has been left with a large, disfiguring scar.

"Plaintiff did not offer expert testimony in support of her case. Accordingly, under the authority of the Supreme Court's holding in the case of Robinson v. Wirts, 387 Pa. 291 (1956), an involuntary nonsuit was entered. In the Robinson case, the facts were almost identical to those of the instant case in that the defendant physician had perforated the plaintiff's esophagus by performing a gastroscopic examination necessitating the same surgical procedures employed here."

To these findings we add that plaintiff produced no evidence that there was any improper or unskillful or negligent act, or any proof of lack of surgical skill, or any evidence of negligence by the doctor—plaintiff proved nothing except the happening of the injury and

---

* Italics throughout, ours,

that it resulted from the insertion of the gastroscope. The use of a gastroscope is an intricate surgical procedure employed only at the hands of doctors having specialized training and qualifications. The passage of the gastroscope through the labyrinth of the esophagus and stomach involves care and skill but the success of such passage is dependent not only upon such care and skill but also upon the condition of the wall of the esophagus and stomach and other internal physiological factors. The record shows that Dr. Bralow, in the process of inserting this gastroscope into the patient's esophagus and stomach to determine the correctness of his diagnosis of gastritis, encountered some "resistance" at a point where the esophagus curves. He encountered this "resistance", nothing more and nothing less. *There is not a scintilla of evidence that Dr. Bralow did anything to overcome this "resistance".*

The instant case is ruled directly and unquestionably by *Robinson v. Wirts,* supra, where this Court speaking by Chief Justice STERN affirmed the entry of an involuntary nonsuit and said (pages 294, 296): "Plaintiff contends that the jury should have been allowed to infer negligence on his part from the mere fact of the happening of the occurrence and that there was applicable the so-called exclusive control doctrine, . . .

"Unfortunately for plaintiff the law is definitely to the contrary. Three very recent cases on the subject are Bierstein v. Whitman, 360 Pa. 537, 62 A. 2d 843; Scacchi, Admr. v. Montgomery, 365 Pa. 377, 75 A. 2d 535; and Powell v. Risser, 375 Pa. 60, 99 A. 2d 454. They merely follow a long train of authorities in this Commonwealth to the same effect, holding that no presumption or inference of negligence arises merely because the medical care or surgical operation terminated in an unfortunate result which might have occurred even though proper care and skill had been exercised,

*and where the common knowledge or experience of lay-men is not sufficient to warrant their passing of judg-ment. In such cases the doctrine of res ipsa loquitur or of exclusive control may not be invoked, and expert testimony* in support of the plaintiff's claim is an *in-dispensable* requisite to establish a right of action. . . .

" 'The plaintiff had the burden of proving Dr. Mont-gomery's negligence and *in a case such as this it could be proved only by expert testimony to establish negli-gence in the operation* or a procedure which was not in accord with standard medical practice or negligence in his treatment of the patient after the operation.' [cit-ing authorities]. . . .

"It is thus abundantly clear that since, in all such malpractice cases involving an appraisal of the pro-priety and skill of a doctor or surgeon in his profes-sional treatment of a patient, a lay jury would pre-sumably lack the necessary knowledge and experience to render a just and proper decision, they must be guided by the testimony of witnesses having special or expert qualifications. The only exception to this other-wise invariable rule is in cases where the matter under investigation is *so simple,* and the lack of skill or want of care *so obvious,* as to be within the range of the or-dinary experience and comprehension of even non-professional persons, as, for example, where a gauze pad is left in the body of a patient following an opera-tion (Davis v. Kerr, 239 Pa. 351, 86 A. 1007), or where a dentist, in working on a tooth, uses a tool with a small rotating emery disc at the end and allows it to slip and to remain revolving in the patient's mouth, grinding and tearing her tongue (Dux v. Shaver, 105 Pa. Superior Ct. 344, 161 A. 481). So, likewise, there might be imagined a case where a surgeon engaged in removing a tumor from a patient's scalp would let his knife slip and cut off his patient's ear, or where he undertook to stitch a wound on his patient's cheek and

by an awkward move would thrust his needle into the patient's eye. It would be a matter of common knowledge *and observation* that such things do not ordinarily attend the service of one exercising ordinary skill and experience in the work of surgery *because they involve ulterior or extraneous acts or omissions the judgment of which would not require scientific opinion.* But such is not the present case."

Appellant contends (1) the doctrine of res ipsa loquitur applies, (2) the doctrine of exclusive control applies, (3) the evidence was sufficient to prove negligence, and (4) for some other reason which is obscure, a surgeon has the burden of proving that he exercised due care and skill and followed the established practice if the operation is unsuccessful. Each of these contentions has been heretofore rejected by this Court and is devoid of merit.

We have quoted at great length from *Robinson v. Wirts,* supra, (a) because the evidence of supposed negligence was stronger for the plaintiff in that case than in the instant case, and (b) because it so well answers and specifically refutes all of the contentions made by this appellant.

In *Robinson v. Wirts,* supra, when the doctor encountered "resistance" he *did something* to overcome the "resistance", i.e., he applied "gentle pressure and insufflation". In the instant case there is, we repeat, not a scintilla of evidence that Dr. Bralow did anything to overcome the "resistance" which was caused by persistent cardiospasm. Furthermore it is clear as crystal that this internal and exceptionally difficult examination by gastroscope is not a matter of common knowledge or common observation by laymen, nor does it involve extraneous acts the judgment of which would not require scientific opinion.

Judgment of nonsuit affirmed.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

In affirming the nonsuit in this case the Majority follows precedent which is commendable, but, in looking back over the landscape of the law, it apparently trains its glance on a small hill instead of the towering mountain which overshadows the hill and all the terrain in between.

The hillock, which impresses the Majority, is the decision of *Robinson v. Wirts,* 387 Pa. 291, decided in 1956. The skyscraping mountain which eludes its view is the case of *Davis v. Kerr,* 239 Pa. 351, decided in 1913.

Let us look at the mountain first, which certainly can be seen without a telescope, and then later pick up the microscope to study *Robinson v. Wirts,* supra, as it casts its anaemic shadow on the panorama of law and justice.

In the *Davis v. Kerr* case, the defendant-surgeon failed to remove from the plaintiff's abdomen, in which he was operating, a sponge he had employed during the surgery. A lawsuit charging him with negligence followed. At the trial, the Court affirmed a defendant's point as follows: "If the jury find from the evidence that a sponge, or other material of like nature, was left in the abdomen of Mrs. Davis, at the time of the operation, such fact alone is no evidence of negligence on the part of the defendant." The jury found for the defendant and the plaintiff appealed. This Court reversed, and Justice STEWART, speaking in language as clear as a mountain brook, and with logic as irresistible as Aristotle's, said: "Why was a foreign substance left in the parts which the operating surgeon should have removed? *It was for him to acquit himself of negligence with respect to it.* The sponge escaped his observation, why? Was it so hidden and concealed that reasonable care on his part would not have disclosed it; or were conditions such that in his professional

judgment further exploration by him for sponges would have endangered the safety of the patient? *In a word, did he do all that reasonable care and skill would require? Except as one or the other of these questions can be answered affirmatively from the evidence, the law will presume to the contrary, and attribute the unfortunate consequences to his contributing negligence.*"*

In the case at bar the defendant-doctor handled a gastroscope in such a manner that he punctured the plaintiff's esophagus and partially collapsed her right lung. As a result the patient almost died. In addition, she had to undergo major surgery because of the puncture. An incision had to be made from "the vertebra to the clavicular line", the seventh rib had to be removed in order to reach the perforation and forty-one stitches were required to patch the break.

Did the doctor use due care when he thrust the gastroscope into the plaintiff's gullet? If he did, he is not responsible for the horrible injury, pain and agony suffered by the plaintiff, but if he failed to exercise proper care, why should the plaintiff be denied her day in court to show what she is entitled to by way of recompense for the terrible hurt inflicted upon her?

The Majority of this Court says that the doctor is not required to show whether he did or did not use due care because the plaintiff did not bring into court another physician to stand before the doctor-defendant, level an accusing finger at him, and charge him with what perhaps is to the medical profession the most odious word in the language—malpractice. But is this the law? Of course, it takes no philosophical stethoscope to determine the reason why doctors are reluctant to testify against other doctors, but such reluctance should not act as a closed door against a meritorious

---

* Italics throughout, mine.

claim by someone who has suffered through a doctor's negligence.

I stand second to none in my boundless admiration for the medical profession. In my estimation, statesmen, industrialists, inventors and philosophers are inconsequential, so far as contributing to human happiness is concerned, as against the doctor who is dedicated to health—the sweetest desideratum in life because without health one has not the strength to squeeze the orange of existence to obtain the elixir of the joy of living.

But after having paid my sincere tribute to doctors, I would not place them on a marble platform of impeccability and infallibility. They are human and therefore subject to all the foibles and weaknesses of the flesh which occasionally manifest themselves through indolence, indifference, carelessness and incompetence in a particular field which requires the maximum of competence, attention and care.

And if one doctor is negligent, the rest of the medical world does not need to feel that this constitutes an adverse appraisement of their own skill and their own supreme dedication to the welfare of man.

The plaintiff in this case, Mrs. Katherine Demchuk, entered the Kensington Hospital in Philadelphia on August 16, 1955, complaining of pains in her abdomen. She was examined by the defendant, Dr. S. Philip Bralow, who, after studying X-rays and the results of other tests, diagnosed her condition as "antral gastritis." In order to thoroughly explore the possibilities of this condition he decided to probe the interior of her stomach with a gastroscope, which is a semi-flexible tube some three feet long and seven-eights of an inch in diameter. But it is more than a tube. In describing the apparatus Dr. Bralow said: "this instrument can be bent in a roughly 60 or 70 degree angle and not obliterate the optic system. We have at the tail-end a rubber finger,

which is used to direct the passage of the instrument through the esophagus. The next portion is a light, which is roughly about the equivalent of 10 candle-power. The next portion of the instrument is the lens, and this acts very much as a periscope. In fact, this instrument was modeled after a periscope. This light reflects an image horizontal to it, and reflects through this lens, then shoots the image up through the 48 lens in this portion. This portion of the instrument is rigid, and it has a stainless steel shaft. In the examination, after the instrument is in its place, one looks through this eyepiece and gets the image."

On August 23, 1955, then, Dr. Bralow decided to push this leviathan into the esophagus of the patient, descend into the depths of the chest, and pursue a course which would bring him to the stomach where he intended, periscopically, to look around.

The photograph of an exhibit introduced at the trial reveals the esophagus as a pipe which drops perpendicularly to a point and then curves almost at a right angle just above the stomach, which it finally enters and more or less becomes part of it. It must be obvious to the eye of the rankest amateur in mechanics, propulsion and civil engineering that in order to get any inside object around the curve of that tangential pipe one must proceed with measured caution and retarded momentum. No expert is needed to testify that any force which approaches a curve with exceptional power or unusual velocity will fail to take the curve and plunge ahead, regardless of consequences.

Applying that incontrovertible rule of physics to the instant situation, it would have to be obvious to any person that any insistent pushing behind the advancing ram of the gastroscope would force it not around the curve but against and through the wall of the esophagus which is, after all, only human tissue.

Dr. Bralow testified that he made two attempts to negotiate the curve and that he felt resistance. In spite of this he plunged ahead and when the plaintiff reacted with pain he withdrew the gastroscope and with his assistant rushed her to the X-ray department "to find out whether we had caused any serious damage." He found that he had indeed caused serious damage. He had forced the gastroscope through the esophagus wall. When he was asked: "Is there any doubt in your mind that this perforation or tear was caused by the instrument you were using?" he replied with an unequivocal: "No, sir."

Having admitted that he himself caused the tragic perforation in the plaintiff's esophagus wall, why was he not required, in the words of Justice STEWART in the *Davis v. Kerr* case, to "acquit himself of negligence"? The stark fact that Dr. Bralow punched a hole in Mrs. Demchuk's esophagus raised of itself a question of fact for the jury (again quoting from the *Davis* case), namely: ". . . did he do all that reasonable care and skill would require?" And if he could not answer that question in the affirmative, should not the law, as Justice STEWART said, "presume to the contrary"?

We have said more times than there are State Reports that: "When the thing which causes the injury is shown to be under the management of the defendant, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants that the accident arose from a want of care."*

Could anything have been more under the exclusive control of the defendant than the gastroscope which Dr. Bralow lowered into Mrs. Demchuk's interior? And

---

* *Kotal v. Goldberg*, 375 Pa. 397.

isn't it natural to suppose that if the doctor had used due care he would not have pierced the thin passage within?

The slightest acquaintance with this case prompts questions as inevitably as sparks fly upwards: Did the doctor use the gastroscope properly? Was he skilled in its use? How much experience, if any, did he have in this highly delicate procedure? The record shows that Dr. Bralow was certificated as a gastrophist in April, 1955. Four months later he performed the gastroscopy on Mrs. Demchuk.

If he was thoroughly competent and exercised all the precautions which instinctively, to say nothing of scientifically, suggest themselves, there would be the logical inference that no accident would happen. There is the sad realism, however, that an accident did happen. Did Bralow do what it seems to me should be the first thing a neophyte doctor would be instructed *not* to do? Did he, with youthful enthusiasm, energy, and blind force, push ahead in the curve when he knew, or should have known, that he was in the esophagus curve?

If a passenger in a bus is injured when the bus does not take a curve in the highway, the passenger does not need to prove, in order to make out a prima facie case against the common carrier, that the driver was drunk, that the steering gear was defective, or that the wheels of the vehicle were out of alignment. He shows that the bus did not turn with the road and ipso facto, he has a case in court. It is then up to the bus company to demonstrate that it used due care in that it employed a sober driver, that its steering gear had been tested, and so on.

In the case at bar, the doctor was not called upon to show that he employed a good instrument, that he had a steady hand, that he took every precaution to

avoid a puncture. And so, in the state of the law as the Majority now announces it with this decision, the legal profession is informed that we require a higher responsibility of care from a bus driver who travels over a wide macadamized highway than we require of a doctor who embarks on a journey through the narrow and darkened passages of the alimentary canal.

The Majority, quoting from the opinion of the lower court, and thereby accepting it as its own, cites in support of the nonsuit, the case of *Robinson v. Wirts,* 387 Pa. 291, the one which I have called a small hill amid the mountain ranges of the law. In the *Robinson* case the doctor also used a gastroscope on his patient, he also burst through the walls of the esophagus, and he also was absolved of all responsibility, although he wrought ruin and havoc on his patient. Why? Because no doctor could be found to say in court that Dr. Wirts was negligent. This Court, apparently feeling that some explanation for the tragic mishap was to be expected, said that it was possible that Dr. Wirts broke through Mrs. Robinson's esophagus because her esophagus had "an abnormally weak wall." But this kind of guessing should not have ruled out the plaintiff's case. We said in *Saganowich v. Hachikian,* 348 Pa. 313, that: ". . . the law does not require the elimination of every possible cause of the accident other than that on which plaintiff relies, but only such other causes, if any, as are fairly suggested by the evidence . . . Proofs to a degree of absolute certainty are rarely attainable; it is sufficient that they be such as to satisfy reasonable minds."

In *Liguori v. Philadelphia,* 351 Pa. 494, we said: ". . . it is equally well settled that, since proof to a degree of absolute certainty is rarely attainable in any litigated factual controversy, the law requires only that the evidence as to the operative cause of the accident be enough to satisfy reasonable and well-balanced

minds that it was the one on which the plaintiff relies."

Thus, in the realm of possibilities, it was more likely that the doctor was careless than that the walls of Mrs. Robinson's esophagus were constructed of tissue paper. But the Majority argued in that case that the doctor's negligence was not so clearly manifest that a jury could find him responsible for the injury he inflicted upon Mrs. Robinson. The Majority then gave an illustration of the kind of negligence which *would be clear* and which would do away with the necessity for the calling of expert evidence. Let us suppose, the Court said, a case " 'where a surgeon engaged in removing a tumor from a patient's scalp would let his knife slip and cut off his patient's ear.' " In such a case, the Court assured the legal profession, the patient would not have to call expert testimony to show that the surgeon was negligent. In the present state of the law, however, as announced by this decision, I am not so certain that the one-eared patient would still not be thrown out of court on his other ear if he did not come into court accompanied by a doctor who would testify that in cutting off the plaintiff's ear the defendant surgeon was not living up to the standard of care and loyalty required by doctors under the Hippocratic oath.

The Majority gave another illustration where expert testimony would not be needed, namely, where a surgeon " 'undertook to stitch a wound on his patient's cheek and by an awkward move would thrust his needle into the patient's eye.' " But in such a situation who would determine that the surgeon's move was an "awkward move"? The jury, of course. Why shouldn't the jury in the present case, then, have been allowed to determine whether the defendant was not engaged in an "awkward move" when he forced his gastroscope through the right angular wall of the esophagus instead of easing it around the corner?

Sometimes lawyers in their briefs will cite without analysis or explanation a string of cases with an attitude that the mere enumeration of names, initials and digits, establishes their position on Mt. Sinai. I am not always impressed with this conciseness of a telegraphic code and this sterility of expository projection. And I am no further impressed when this cabalistic enumeration is done by a Court. Thus, the Majority cites, as if uttering the last word in irrefutable postulation the cases of *Bierstein v. Whitman,* 360 Pa. 537, *Powell v. Risser,* 375 Pa. 60, and *Scacchi v. Montgomery,* 365 Pa. 377.

It so happens that no lawyer could describe these cases to a layman without embarrassment because if they are symbolic of justice through law, the average layman might have reason to feel that in entering a courthouse he is passing over the threshold of a house of mystery.

In *Bierstein v. Whitman,* supra, the plaintiff suffered a broken jaw when a dentist set about to extract a tooth. The smashed-jaw plaintiff brought a suit against the dentist and he was nonsuited. This Court affirmed the nonsuit with the statement that: "Negligence may not be inferred by laymen merely because the jaw was found to have been broken. A jaw could be broken even though there was no lack of care or skill by the dentist."

In the absence of evidence that the patient had a "glass jaw," why would there not be an inference that only negligence could shatter the osseous mandibles of a healthy human being? Of course, we can understand that in the old days when teeth were removed with chisel and hammer, a jaw could suffer breakage even though the extraction were performed by the ablest blacksmith in the town. But if law is supposed to keep pace with modern progress in dentistry, surgery, engineering and every other field of science, it cannot pos-

sibly accept a fractured jaw as a normal sequence of a tooth extraction. The *Bierstein* case, incidentally was decided in 1948, not 1848!

The decision in *Powell v. Risser*, 375 Pa. 60, fractures one's sense of justice even more than the *Bierstein* case. In that case one witness testified that the plaintiff's hands were swollen " ' two and a half to three times their normal size and resembled two raw steaks. There were blisters in the center of both palms, about the size of a half-dollar, and other blisters over his hand and fingers.' " There was evidence that these blisters were toxic and capable of spreading poison throughout the patient's body. The doctor in the case operated on these blisters with an ordinary penknife which he carried around in his pocket. He did not sterilize the blade, he took no precaution to prevent infection. As a result of the ensuing infection the patient lost 60% of the functioning of both hands. Why would not such an obvious flagrant violation of the most elementary rules of hygiene become a case for a jury to decide without the necessity of expert testimony? Why would such gross and almost wanton negligence differ from the negligence of the surgeon who by mistake slices off the patient's ear? I have said it before and I repeat it here that: "The injustice of the decision in the Powell case is so palpable that to expatiate on it further can only increase one's moral indignation without decreasing one's intellectual revulsion which is complete. Time cannot dim, for me, that abhorrence, and I accordingly cannot permit citation of the Powell decision as authority for any case today, without repeating the protest I made at the time of the original decision."

In the case of *Scacchi v. Montgomery*, 365 Pa. 377, where the patient died, the defendant-surgeon admitted: " 'I don't know, it never happened to me before, I must have gone too deep or severed the vein' ", " 'May-

be it happened I went too deep or skipped some vein.' "

This Court, in affirming the nonsuit entered there, said: "In the light of all the evidence presented, the Court below held and we concur that these statements were too vague or indefinite to establish negligence."

What is the difference between cutting the wrong vein and slicing off a man's ear? Especially when the doctor admits that he went beyond the depth of his knowledge, experience and skill?

After citing the *Bierstein, Powell,* and *Scacchi* cases, the Majority says that these cases " 'merely follow a long train of authorities . . . holding that no presumption or inference of negligence arises merely because the medical care or surgical operation terminated in an unfortunate result which might have occurred even though proper care and skill had been exercised, and where the common knowledge or experience of laymen is not sufficient to warrant their passing of judgment.' "

But this "long train of authorities" does not take the Majority across the desert of *Bierstein, Powell* and *Scacchi* back to the mountain peak of *Davis v. Kerr* where Justice STEWART, speaking for this Court in 1913, said that if a doctor leaves a sponge amid the entrails of a patient he must explain why. And if a doctor forces an instrument through those same entrails, why shouldn't he be made to explain why, or otherwise be regarded as negligent?

Although the Majority of this Court has accepted the lower court's opinion as its own, the decision of the lower court was only a reflection of what this Court had said in the *Robinson* case and did not represent its own sincere convictions in the matter. In point of fact it can be said that the Majority Opinion here is in the nature of a performance in ventriloquism because while it seems *to be quoting the lower court it is in* reality only re-speaking its own words.

The true views of the lower court were expressed when the trial judge, VINCENT A. CARROLL, battle-scarred veteran of war and the courts, addressed the jury as follows: "My entire sympathies are with the plaintiff in this case, but sympathies can't control the law. I do not have the authority, and I would not arrogate to myself the power to change the law, although I am in sharp disagreement with it. The law in Pennsylvania on this point is clearly annunciated in the Robinson and Wirts case, which was decided in 387 Pennsylvania 291."

Judge CARROLL believed that, under the restrictions of the *Robinson* case, the plaintiff did not present the kind of evidence which he could properly submit to the jury, but he went on to say to the jury: "If there had been the slightest iota [of that type of evidence] I would have presented the case to you, because I believe the medical profession has responsibility in matters of this kind not to hole up, not to run into a covered shell when these things happen, but to admit that a doctor can make a mistake. They advance the theory that doctors cannot make a mistake, and they have been doing that for years. Well, I have the highest regard for the medical profession, especially the great doctors we have in Philadelphia. Notwithstanding their high professional standing, their high degree of intelligence and their high standards, in this one area where these things occur, you can never get one doctor to testify against another, and that to me is a deplorable condition. I have had this feeling for years."

In concluding to the jury, Judge CARROLL said: "I want to say this by way of conclusion, because this record may go to the Supreme Court, my feeling about the Robinson-Wirts case is this: I think it constitutes an unwarranted extension of protection to the physician, absolutely unwarranted, and this case establishes that fact. Certainly, it seems to me if the effect of a

doctor's diagnosis or his treatment is in issue, a lay jury is not competent without expert testimony to pass on medical propriety, and you can't get medical testimony in any part of this great big wide world, and the time has come, and what I have said here may help accelerate that time, that the law will be so formed as to permit the testimony of persons not particularly skilled in medical practice, but people with common sense, and conclusions will be permitted to be drawn from the presumptions that arise in cases of this kind. As of this moment, a lay jury is not competent to pass upon medical propriety, and that is the Robinson case in a nutshell.

"However, let me say that where care is exercised by a doctor in effecting an otherwise proper treatment, when that is at issue, the use of care by the doctor, it should present a jury question. However, the Robinson-Wirts case says it does not, and again I say it isn't for this court to arrogate to itself the authority to disrupt the existing law of Pennsylvania, with which I am, however, definitely out of accord.

"Therefore, I am going to grant a nonsuit. If the Supreme Court reverses me, as I hope it will in this case, I would be very much happier than if they affirmed what I have done here this morning."

I greatly regret that this Court did not reverse the nonsuit, as Judge CARROLL recommended, and I particularly regret that it has not levelled the little hill of *Robinson v. Wirts.*

A decision of this Court which does not even command the respect of the trial courts, is even a smaller hill than the one I have pictured on the terrain of jurisprudence. Nevertheless, I believe that if time does not work its erosion until the *Robinson* case can no longer be pointed to as a landmark, a reappraisement of the entire subject matter will bring into respectful and obedient focus the authority of *Davis v. Kerr.* And,

with the justice and logic of that decision restored to the law, patients may then enter hospitals assured that they will be as fully protected when the doctor engages himself in the dark, labyrinthian passages of the inner man as when the doctor, in a state of absent-mindedness, slices off an indispensable ear.

### DISSENTING OPINION BY MR. JUSTICE BOK:

I do not think that *Robinson v. Wirts,* 387 Pa. 291 (1956), 127 A. 2d 706, is analogous or controlling.

In *Robinson* the tube reached the entrance to the stomach and met resistance. The defendant sought to overcome it by "gentle pressure and insufflation", which would distend the walls of the stomach and clear the passage for the tube, and was the normal and recognized method of overcoming an obstacle caused by spasm. A nonsuit was entered because there was no expert evidence that standard practice was not followed under such conditions or that there was negligence.

Here the tube did not reach the entrance to the stomach but punctured the esophagus at the point where it curved. This stance of fact removes the case from the category of those requiring expert testimony of standard practice or its lack. Rather the case falls within the class of patent and obvious negligence listed in *Robinson* at page 297, such as leaving a drill revolving in a patient's mouth and tearing her tongue, or stitching a cheek and awkwardly thrusting a needle into the patient's eye. The defendant in the case before us, who must be held to know that an esophagus curves and that there may be spasms and hence resistance, thrust the tube downward in such a way that it failed to follow the curve but instead plunged straight ahead through the wall of tissue. Such a conclusion requires no further evidence to reveal the operator's negligence.

The majority concerns itself to no purpose with the doctor's "meeting resistance", saying that there is not a scintilla of evidence that he did anything to overcome the resistance that he said he met. It is clear from his testimony that when he met it he withdrew his instrument not once but twice. He knew what resistance meant at that point the first time, or he would not have withdrawn the instrument. And the patient did not complain of pain, the tell-tale of puncture, until after defendant withdrew his instrument the second time. He admits that there is no doubt it was his instrument that pierced the wall of his patient's esophagus. Merely meeting resistance appears to have been enough to do the damage. The instrument did not push itself.

I see resistance as having nothing to do with the case except to make it clearer. Whether there was resistance or none, defendant admitted that his instrument went through the esophagus wall. Since no one else was on the operational end of it, it follows that he pushed it through and caused damage that he must have known could follow such a performance. This was more than the mere happening of an accident. He took the chance it wouldn't happen, but it did, and let us not forget that this was not a critical operation but only an exploratory one.

This is a very different affair from *Robinson* and should have been left to the jury. I dissent with verve.