George A. HONEYWELL, Jr., and Judith Honeywell, natural parents and next of friend of Deborah Honeywell, a minor, and George A. Honeywell, Jr., individually, Plaintiffs,

v.

Dr. George E. ROGERS and Conemaugh Valley Memorial Hospital, Defendants.

Civ. A. No. 64-034.

United States District Court
W. D. Pennsylvania.
March 28, 1966.

B. Goldstone, of Routman, Moore & Goldstone, Sharon, Pa., for plaintiffs.

J. Lawrence McBride, Dickie, McCamey & Chilcote, Pittsburgh, Pa., for defendant Dr. Rogers.

Ira R. Hill, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant Conemaugh Valley Memorial Hospital.

WEBER, District Judge.

This is a diversity negligence malpractice action based on an allegation that minor plaintiff suffered permanent injuries from the result of a hypodermic intramuscular injection administered by a nurse in defendant hospital while minor plaintiff was a patient there under the care of defendant physician. Subsequent to the filing of this action and before it came to trial the Pennsylvania Supreme Court abolished the charitable immunity doctrine which had insulated hospitals from liability on such claims. Flagiello v. Pennsylvania Hospital, 417 Pa. 486, 208 A.2d 193 (1965). The case proceeded to trial against both defendants, and the jury returned a verdict in favor of the plaintiffs against the defendant Conemaugh Valley Memorial Hospital and for the defendant Dr. George E. Rogers. The defendant Conemaugh Valley Memorial Hospital has moved for a new trial.

The minor plaintiff, Deborah Honeywell, then eleven months old, was admitted to defendant Conemaugh Valley Memorial Hospital in Johnstown, Pennsylvania, as a private patient of defendant, Dr. George E. Rogers, for medical treatment for an acute attack of bronchitis and anemia. She was confined in said hospital from February 7, 1962 to February 17, 1962, and during that period was administered approximately eighteen intramuscular injections of various drugs, including penicillin and Imferon [1] alternately in the left and right buttocks. These injections were given by the members of the nursing staff of the hospital in accordance with the hospital procedure and in accordance with medication orders given by defendant Dr. Rogers in writing on the patient's order sheet of the hospital record. There is no dispute in this case that the nurses and student nurses were agents of the hospital. There was also no evidence introduced in this case of any negligence on the part of defendant Dr. George E. Rogers personally; his liability, if any, would have to be based on the doctrine of *respondeat superior*.

Around noon of February 17, 1962, Dr. Rogers visited the patient and signed the order for her discharge from the hospital. At that time he signed an order on the order sheet that an injection of 2 cc of Imferon should be administered to the patient at the time of discharge. The mother of the minor plaintiff testified that at the time of making this order the Doctor talked to a registered nurse explaining that the Imferon injection should be given with a "Z-track" technique and in so explaining drew a sketch illustrating this technique on a piece of paper. At the trial such a sketch was shown on the backside of one of the sheets of the hospital record which had been introduced into the evidence. The doctor was not present when this injection was administered, nor was he present at the administration of any of the other injections during plaintiff's stay in the hospital.

It is the injection of 2 cc of Imferon into the left buttock of plaintiff at about 2 p. m., February 17, 1962, that forms the basis for this action. The mother of the minor plaintiff testified that the injection was given by a student nurse, later identified as Ruby Saylor Poole, who was assisted by an unidentified registered nurse who held the child's legs while the mother held the head and arms of the child. The mother testified that it appeared to her that the injection was given toward the center of the buttock and not where prior injections had been given. The mother also testified that the other nurse made a remark to Nurse Poole to the effect that the injection had not been given in the right place but that

[1.] A registered trade name of an iron-dextran complex, produced by Lakeside Laboratories, Inc., of Milwaukee, Wisconsin.

844

she felt that it would be effective anyway. The mother further testified that the child screamed more violently than she had on previous injections, that the site of the injection became red and inflamed, and that when the child was taken home from the hospital she continued to complain, that she favored her left leg and hip and that the leg was cold to the touch and painful to the child when touched.

The only other witness to this injection who was produced was Ruby Saylor Poole. She had no independent recollection of the event, having had no notice of any subsequent development until almost two years later. Mrs. Poole's testimony as to the incident was entirely based on entries in the hospital records and her memory of hospital training and practice.

The child developed symptoms involving the sciatic and peroneal nerve and has been examined and treated by a number of doctors. There is no dispute at this time that she suffers a permanent impairment of paralysis of the lower left leg and foot, a condition commonly known as "foot-drop."

The plaintiff has introduced evidence of the causal connection between the injection in question and the injury suffered by the minor plaintiff through the testimony of Drs. Swain and Silenskey. It, therefore, becomes our problem to determine whether or not the plaintiffs have established that the injection was given in an improper manner or in an improper area or under improper circumstances. This cannot be established from the mere occurrence of the injury and would require the production of expert medical testimony to establish negligence by a procedure which was not in accord with the standards of medical or hospital practice. Demchuk v. Bralow, 404 Pa. 100, 170 A.2d 868, 88 A.L.R.2d 285 (1961); Robinson v. Wirts, 387 Pa. 291, 127 A.2d 706 (1956).

A great number of witnesses and a large body of medical testimony was produced on this point. The plaintiffs produced testimony both from their own witnesses and by the admissions of parties, or cross-examination of defendants' witnesses that it is improper and contrary to accepted medical practice to make an injection in the sciatic nerve area of the buttock. The sciatic nerve bundle, which at this point contains several subsidiary nerves, is located in the approximate center of the buttock although somewhat upward and outward from the center of the cheek of the buttock. These two areas are not concentric as was shown by an anatomical illustration at the trial. The location of the upper outer quadrant is not capable of exact definition. The exact location of the sciatic nerve in this area varies in individuals. Testimony that it was accepted and recognized by all doctors and nurses that no injection of any kind should be made in the sciatic nerve area and that such injection if done would be in violation of recognized standard medical, nursing and hospital procedures, was elicited from the defendant, Dr. Rogers; from Mrs. Cook, the chief nurse of the pediatric section of defendant hospital, and from Dr. Wiley, the director of defendant hospital's department of physical medicine, in addition to testimony of plaintiffs' witnesses.

The defendant's expert medical testimony was that the proper area for intramuscular injections was the upper outer quadrant of the buttock. If we were to superimpose the face of a clock upon the face of the left buttock this would be the area between the hands at nine o'clock and twelve o'clock. The upper outer quadrant guide was used for two reasons: to stay away from the sciatic nerve as much as possible and to place the medication into the large muscle at the outer periphery of this quadrant so that it would be absorbed more readily. However, the medical witnesses admit that in using the standard of the upper outer quadrant there should be no injection into the medial portion of this quadrant. It was shown by anatomical charts that the lower corner, or the apex of the lines which form the angle of the quadrant, was the area where the sciatic nerve would be found. The medical witnesses admitted that an injection given in this

area could damage the sciatic nerve and that no injection should be given in this medial area according to standard medical practice.

Plaintiffs' evidence to establish the location of the injection was the eye-witness testimony of Mrs. Honeywell, the mother of the minor plaintiff. Dr. Silenskey testified with reference to an anatomical diagram that the area described by the mother as the location of the injection would be over the sciatic nerve area. In addition to this eye-witness testimony there was circumstantial evidence supporting the contention that the injection was not given in the medically accepted proper area. Other medical witnesses found that brown stains such as are sometimes left by an Imferon shot were present on the child in the sciatic nerve area. While other medical witnesses testified that they found evidence of intramuscular injection punctures in the upper outer quadrant of the minor's buttock away from the sciatic nerve area, they could not establish when these injections had been made. The child had received many such injections.

There was evidence that the sciatic nerve in this minor plaintiff of eleven months of age would be located approximately one inch below the skin surface in the center of the buttock. While the instructions issued with Imferon by the manufacturer calls for the use of a two inch needle the defendant hospital in its pediatric ward adopted a one and one-half inch needle as a "pediatric adaptation" for this purpose. Medical testimony was produced to the effect that an injection at or pointed toward the center of the buttock with a needle this size would come into the sciatic nerve area. That the injection in question did come into the sciatic nerve area is further supported by the symptoms which the minor plaintiff developed in a short period of time after the injection, the evidence of unusual pain shown by the child, the cold and sensitive condition of the leg, and the child's other reactions in connection with the leg.

The defendant hospital produced an extensive body of testimony as to the training and supervision of student nurses in its School of Nursing, particularly with reference to the technique of administering intramuscular hypodermic injections. The nurses were trained in anatomy and in the use of anatomical landmarks to determine the site of such injections. They had extensive practice in the use of the hypodermic needle, first on anatomical models or dummies and then on actual patients under direct supervision. There is no question that the student nurse involved in this case had received proper and adequate training in the technique of insertion of the hypodermic needle. It was further shown that they were instructed that the location of intra-muscular injections to be administered in the buttock area was the upper outer quadrant of the buttock. This is in accord with standard medical and nursing practice and technique as substantiated by the testimony of physicians, instructors in nursing and standard text books on the subject. However, it was equally as well established by the plaintiff that it was not proper medical or nursing technique to give such an injection in the buttock in the area of the sciatic nerve.

Finally the evidence, illustrated by the use of anatomical models and charts, showed that the sole reliance on the criteria of upper outer quadrant did not prevent an injection even in that area from also being given in the area of the sciatic nerve.

We come to the conclusion, therefore, that while the defendants' evidence established that it is standard medical practice and standard nursing procedure to give such an injection in the outer upper quadrant of the buttock it is equally as well established that it is improper medical procedure to give such an injection in the area of the sciatic nerve and that the definition of these areas, while not exact, will overlap in the center of the buttock. Therefore, the Court refused the defendant hospital's first point for charge to the effect that the injection

was not negligently inflicted if administered in the upper outer quadrant of the buttock. In the same vein to a requested charge by defendant hospital to the effect that the standard and accepted practice of administering intramuscular injection was that such injection should be made in the upper outer quadrant of the buttock we added the qualification "and away from or not in close proximity to the sciatic nerve." All of the nursing personnel knew of the dangerous consequences of an injection into the sciatic nerve area, either from actually striking the nerve or from the congestion of the injected material in close proximity to the nerve. That the injection was given in the sciatic nerve area is supported by the eye-witness testimony of plaintiff's mother. There is no direct evidence that the injection in question was not given in the sciatic nerve area.

This case did not, therefore, present either a *res ipsa loquitur* situation, nor an exclusive control situation, but rather a case where the standard of care has been established by competent medical testimony. This is the standard required by Demchuk v. Bralow, 404 Pa. 100, 170 A.2d 868, 88 A.L.R.2d 285 (1961). Eye-witness testimony and supporting circumstantial evidence placed the site of the injection near the sciatic nerve area.

Nor do we find that the jury's verdict was contrary to the weight of the evidence. While the defendant hospital produced a great mass of testimony to establish the upper outer quadrant rule it actually produced little evidence to contradict the eye-witness testimony of the mother as to the site of the injection. A plain issue of credibility of testimony was presented to the jury.

Defendant hospital argues that the verdict is excessive and that prejudicial remarks made by plaintiffs' counsel in his closing address to the jury contributed to the excessiveness of the verdict. The award to the minor plaintiff was $45,000. That this child is permanently crippled is not denied; that one foot is paralyzed, toed-in, subject to further muscle atrophy, and requiring braces and orthopedic appliances is not denied. The necessity for a surgical operation to help alleviate this condition was not denied, and the necessity for further surgical procedure during her teens is not denied. That she will have a permanently paralyzed, deformed left foot for the remainder of her life is not denied. We can by no means call the award to the child excessive. The parents on the other hand were awarded $11,453. They have incurred medical expenses to date of $1,252. and they will be required to expend further sums in the future for surgical operations to alleviate the condition, all of which may total $2,500. for medical expenses. The child will require corrective shoes and other orthopedic devices and will always require shoes of different sizes for the two feet. While the balance of the award to the parents must be allocated to the loss of earnings which they will suffer until this child reaches majority we do not think it beyond a reasonable determination of the jury that the loss of earnings may be more severe because these parents may be deprived of earnings which otherwise might come to them in their effort to continue the education or training of this child for some occupation where her physical disability will not be so great a handicap. Without regard to the alleged prejudicial remarks of counsel we cannot find the award to the parents to be so excessive as to shock the conscience of the Court. That they may be high or higher than the Court would itself have awarded is no criteron. We must rather consider whether the jury might reasonably have determined upon such a figure from this evidence. We cannot find it unreasonable. Therefore, the remarks of counsel which are alleged to have been a plea to the sympathy of the jury in urging it to give a high award did not, in the opinion of the Court, lead the jury to disregard its duty and make an award which was not justified by the evidence presented to it.

Finally, defendant hospital argues that the verdict of the jury in favor of the defendant, Dr. George E. Rogers, was

against the weight of the evidence in the case. The jury rather quickly came to a determination that Dr. Rogers was not liable in this case. During the course of the deliberation it requested further instructions of the Court and in connection with these instructions, it stated on its written message to the Court: "We have decided in the sense of agency that the hospital is the sole owner or master of the trainee who gave this injection. How is this written in legal terms?" As we have stated there was no evidence of personal negligent action on the part of defendant, Dr. Rogers, in this case and it was submitted to the jury under an instruction that liability, if any, of the defendant Dr. Rogers must rest upon agency. Defendant hospital argues that the evidence against Dr. Rogers shows that he prescribed the medication and the general manner in which it was to be administered; that he had the right to control the nurse who gave the injection; and that he gave a detailed explanation to a registered nurse as to how the injection of February 17, 1962 was to be given. With reference to the instructions given by the doctor to an unidentified nurse at the time the doctor was signing the discharge order for the patient the evidence shows that he directed that this injection be given with a "Z-track" technique. This technique was fully explained by several of the witnesses in this case consisting of drawing the skin to one side when making the injection so that the skin would slide back over the site of the injection into the subcutaneous tissue and seal the injected material off from direct access to the puncture which the needle made in the skin. This was advisable in the administration of Imferon because if the injected material would leak out of the site into the area of the skin puncture it would permanently stain the skin. This tends further to explain the evidence of some of the medical witnesses that they found such a stain on the buttock of the minor patient which extended down toward or over the sciatic nerve area of the buttock. The "Z-track" technique was known and practiced by the nursing personnel in defendant hospital, and the Imferon injections given the minor plaintiff in the hospital were done by this technique. In any event the order pertaining to the Z-track" technique was in no way connected by the evidence with the selection by the nurse of the site of injection.

Otherwise, the testimony presented by defendant hospital in this case tending to establish that all of the nursing personnel were fully trained and competent to give such injections as a standard and regular part of the hospital services, all served to insulate the treating physician from the action of the hospital staff. The jury was charged that the liability of the defendant Dr. Rogers would depend upon its making a finding that the nurse, the admitted employee and servant of the hospital, also became the servant of the doctor by reason of his right to control the act to be done and the manner of its performance. The law of Pennsylvania imposes liability on the physician in a situation where the negligent act is performed by an employee of the hospital only in those cases where it is shown that the doctor had direct charge of the administration of the treatment, a duty to supervise its administration, and the right to control the act to be done and the manner of its performance. Under this doctrine liability has been imposed in the Pennsylvania cases in what is known as the "operating room" cases, where a surgical procedure has been involved. Because of the necessity of absolute authority of the operating surgeon in the critical surgical situation it has been held that where the authority of the doctor was complete, as with the surgeon in charge of the operating room, responsibility rests upon the surgeon for all acts of all hospital personnel who assist him or who are responsible for the carrying out of the operative and post-operative procedures. This is also called the "captain of the ship" doctrine under the analogy that the surgeon in the operating room

"is in the same complete charge of those who are present and assisting

him as is the captain of a ship over all on board, and that such supreme control is indeed essential in view of the high degree of protection to which anaesthetized, unconscious patient is entitled * * * ."

McConnell v. Williams, 361 Pa. 355, at p. 362, 65 A.2d 243, at p. 246. This liability has been extended to a surgical patient injured as a result of the negligence of an interne and resident employed by the hospital in the post-surgical treatment of the patient, even though the surgeon was no longer present. Yorston v. Pennell, 397 Pa. 28, 153 A.2d 255, 85 A.L.R.2d 872 (1959). It applies even where the mistake is that of other physicians while the patient is under the direction and control of the surgeon preparatory to surgery. Rockwell v. Kaplan, 404 Pa. 574, 173 A.2d 54 (1961).

■ There is no question, however, that the "operating room" or "captain of the ship" doctrine has not been extended beyond the surgical situation in Pennsylvania.

Shull v. Schwartz, 364 Pa. 554, 73 A. 2d 402, 403 (1950), strictly limited this liability to the operating room situation, quoting from McConnell v. Williams, 361 Pa. 355, 65 A.2d 243 (1949):

" * * * [A] surgeon's liability [does not] apply, *after the operation is concluded,* to treatment administered by floor nurses and internes in the regular course of the services ordinarily furnished by a hospital; as to all such care and attention they would clearly be acting exclusively on behalf of the hospital and not as assistants to the surgeon." 364 Pa. at p. 556, 65 A. 2d at p. 247.

■ While the *Shull* case involved post-operative care of a surgical patient the court held that the services performed were part of the routine services of a hospital rendered to patients. While later cases expanded the "operating room" rule we are entirely outside a surgical situation in the instant case. No surgery was performed on the minor plaintiff here. She was entered into the hospital for intensive care and treatment which consisted largely of the regular administration of medicaments, primarily penicillin to combat the infection, and Inferom to combat an anemic condition. The defendant hospital has shown by its own evidence submitted in support of accepted medical procedures and standards that the matter was entirely one of hospital routine. The attending physician was not present and was not usually present during the administration of such medicines. The attending physician's orders were delivered to a floor nurse who had general charge of the patients on the floor, but who was not necessarily involved in the administration of the medicines. The particular student nurse who administered this injection in the instant case did so because on that day it was her particular assignment as "medicine girl" to fill all the medication orders for the ward. She would take these orders as written on the order sheets by the various attending physicians, order the medication from the hospital pharmacy, and proceed to its administration. She was fully trained to do this and any supervision or control was exerted, not by the attending physician, but by the supervising nurses in the particular department. The physician did not select the one who was to administer the medicine since this was normally considered by all parties as part of the ordinary hospital routine. The jury was fully charged on the agency principles involved and came readily to the conclusion that in this situation the administering nurse was not the agent of the doctor and no liability was imposed upon the defendant doctor by them under these instructions. The defendant doctor objected to the submission of the question to the jury, arguing that this case fell squarely within the line of cases which hold as a matter of law that the physician is not responsible for routine treatment administered by employees of the hospital. Upon such instructions the jury's finding was in accord with the law as set forth in the body of cases which follows the rule of *Shull,* supra. It is fully in accord with

the rationale of the line of cases which impose no liability upon physicians in such a situation.

Under all the circumstances we feel that the issue of the standard of care was properly submitted to the jury; that there was substantial evidence to support their findings, both by expert testimony and by eye-witness testimony, and that the issue of credibility was properly the function of the jury.

We can find no grounds upon which to set aside the verdict as contrary to the weight of the evidence in this case.

Motion denied.