## McConnell, Appellant, *v.* Williams.

356

Argued January 6, 1949. Before Maxey, C. J., Drew, Stern, Patterson, Stearne and Jones, JJ.

*Thomas E. Waters,* with him *Frank R. Ambler,* for appellants.

*Charles E. Kenworthey,* with him *Reed, Smith, Shaw & McClay,* for appellee.

OPINION BY MR. JUSTICE HORACE STERN, March 25, 1949:

Physicians and surgeons, like other persons, are subject to the law of agency, and one of them may be, either permanently or temporarily, in the service of another. The question in the present case is whether such a relationship existed between a hospital interne and defendant, a practicing surgeon, during the latter's performance at the hospital of an obstetrical operation in the course of which the interne, by alleged negligence, injured the new-born child of the patient.

The facts—assuming plaintiff's testimony to be true—are these: Mrs. Joseph K. McConnell consulted defendant in his professional capacity and she and her huband engaged him to attend her during her pregnancy and to deliver her of an expected child. Finding that a cæsarian operation would be necessary, defendant suggested that it be performed at the Jewish Hospital in Philadelphia where he was one of the chiefs of the obstetrical staff, and accordingly she entered there on December 2, 1943. While the Jewish Hospital is not a public hospital in the sense of being owned or operated by government, it is a non-profit, charitable institution, with both private-patient and ward service, its facilities being available to all.

On December 3 defendant requested one of the internes at the hospital to attend on the following day "to be his assistant and to take care of the baby at the time of the operation," but, being told that that interne would not be on duty, he asked that a certain other interne whose name he mentioned should be informed that "he was to be his assistant and take care of the baby at the time of the delivery." The operation took place on December 4; in the operating room, in addition to defendant and the patient, there were present a nurse attached to the hospital, another nurse privately engaged by Mrs. McConnell, and the interne whom de-

fendant had designated. The operation was apparently a difficult one; the patient suffered profuse hemorrhages which required defendant's complete attention. When the child was delivered he turned it over to the interne for the purpose of tying the cord and applying a solution of silver nitrate to the infant's eyes. Silver nitrate is an extremely caustic drug requiring careful dosage, and proper technique calls for the application of only one or two drops in each eye followed by prompt irrigation. A subsequent analysis of the silver nitrate used on this occasion revealed that it was a 2.1 solution which, it was testified, was not of excessive intensity. The insertion of silver nitrate or other approved prophylactic agent in the eyes of every new-born child is not only a regularly established practice in obstetrical cases but is required by the rules and regulations of the Department of Health of the Commonwealth, the purpose being to prevent the disease known as ophthalmia neonatorum. According to the testimony of Mrs. McConnell's nurse the interne in this case filled a syringe and squirted the solution once into the child's left eye and twice into its right eye, putting into the latter "a great many drops"; moreover, he failed to irrigate the eyes during at least the period of five or ten minutes while this nurse remained in the operating room. The result was that the child lost the sight in her right eye completely, which was so badly burned that it had later to be excised, necessitating a plastic operation and the substitution of a glass eye which she will be obliged to wear throughout her life; the left eye was also severely and permanently scarred. Defendant himself testified that the insertion of the silver nitrate drops was not a job which required any special skill; he said that "it is done by midwives, nurses, students, physicians, and even those who are not educated in medicine in any way."

The present suit in trespass to recover damages was brought against defendant on behalf of the injured child by her father Joseph K. McConnell and by the latter in his own right. At the conclusion of plaintiffs' testimony the court entered a nonsuit. It is their contention that the case should have been submitted to the jury, and that the court was in error in negativing defendant's responsibility as a matter of law. They do not charge defendant *personally* with any act of negligence either of commission or omission; they apparently concede that he is an obstetrician of high repute and that the operation he performed on Mrs. McConnell was entirely satisfactory and not subject to criticism. On the other hand, their testimony made out a prima facie case of negligence against the interne, and therefore the only legal question involved is whether the doctrine of respondeat superior applies, that is to say, whether, for the purpose of and during the course of the operation, which included the immediate caretaking of the infant child, the interne was, in the view of the law, the servant or employee of defendant.

Counsel for both plaintiffs and defendant agree that there is no exact precedent in Pennsylvania for the determination of this question, and little, if any, in other jurisdictions. However, the general principles applicable to the situation are not only clear, but so firmly established that there is no need to explore any new and hitherto uncharted pathway in the law. These applicable principles are as follows:

1. In determining whether a person is the servant of another, the essential test is whether he is subject to the latter's control or right of control with regard not only to the work to be done but also to the manner of performing it: *Walters v. Kaufmann Department Stores, Inc.*, 334 Pa. 233, 235, 5 A. 2d 559, 560; *Joseph v. United Workers Association*, 343 Pa. 636, 639, 23 A. 2d 470, 472. The true criterion is the existence of power

to control the employee at the time of the commission of the negligent act: *McGrath v. Edward G. Budd Manufacturing Co.*, 348 Pa. 619, 623, 36 A. 2d 303, 305.

2. A servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services; he may become the other's servant as to some acts and not as to others: Rest. Agency, § 227. The important question is not whether he remains the servant of the general employer *as to matters generally*, but whether, as to the *specific transaction in question*, he is acting in the business of, and under the direction of, the one or the other: § 227, Comment a. Where one person lends his servant to another for a special employment the test is whether, *in the particular service he is engaged to perform*, he continues liable to the direction and control of his master or becomes subject to that of the party to whom he is lent or hired: *Lang v. Hanlon (No. 1)*, 305 Pa. 378, 382, 157 A. 788, 789; *Rosen v. Diesinger*, 306 Pa. 13, 158 A. 561; *Dunmire v. Fitzgerald*, 349 Pa. 511, 516, 37 A. 2d 596, 599; *Siidekum, Administrator, v. Animal Rescue League of Pittsburgh*, 353 Pa. 408, 413, 414, 45 A. 2d 59, 61.

3. A person may be the servant of two masters, not joint employers, at one time as to one act, provided that the service to one does not involve abandonment of the service to the other: Rest. Agency, § 226. Such is the case where an employee is transferred to carry on work which is of mutual interest to both of two employers and to effect their common purpose: *Siidekum, Administrator, v. Animal Rescue League of Pittsburgh*, 353 Pa. 408, 414, 45 A. 2d 59, 62; *Kissell v. Motor Age Transit Lines, Inc.*, 357 Pa. 204, 209, 53 A. 2d 593, 596.

4. When different inferences can fairly be drawn from the evidence as to who is the controlling master of the borrowed employee at the time of the commission of the negligent act, it is for the jury, not the court, to

determine the question of agency: *Dunmire v. Fitzgerald,* 349 Pa. 511, 516, 37 A. 2d 596, 599; *Siidekum, Administrator, v. Animal Rescue League of Pittsburgh,* 353 Pa. 408, 414, 45 A. 2d 59, 62; *Kissell v. Motor Age Transit Lines, Inc.,* 357 Pa. 204, 209, 53 A. 2d 593, 595, 596.

In applying these principles of agency to the present case it is to be noted at the outset that defendant's obligation under his contract with Mrs. McConnell included not only her prenatal care and the delivery of her child, but also the care of the latter until it was turned over to the family physician. Mrs. McConnell testified, when asked what defendant "said he would do", that "he would perform a cæsarian operation and care for the baby for the sum of $200." Defendant himself, when asked what his agreement covered and whether his liability was to continue until the baby was turned over to the family doctor, answered that "I so considered that it was." It may well have been in contemplation that he might need help in taking care of the new-born infant, and, as it subsequently turned out, such help was essential, but the necessity of employing assistants is one of the ordinary circumstances of both business and professional life; it is to regulate just such situations that the law of agency exists. In selecting a person to aid him in carrying out that part of his undertaking defendant was presumably free to make his own choice; there is nothing in the record to indicate that he was compelled to employ an interne; as previously stated, he testified that as far as the insertion of the silver nitrate solution was concerned it would not have been necessary to use any licensed physician at all. What he chose to do was to call for and borrow from the hospital an interne who thereby became—or so at least a jury might find—his temporary servant or employee for the purpose for which he was engaged.

The next important fact to be considered is that defendant himself testified that he had complete control of the operating room and of every person within it while the operation was in progress. To the question whether they were all subject to his orders during that period his answer was: "Sure". Asked whether the interne was bound to carry out his orders, his answer was: "That is correct". And indeed it can readily be understood that in the course of an operation in the operating room of a hospital, and until the surgeon leaves that room at the conclusion of the operation, (the "operation" in the present case including the tying of the cord and the insertion of the silver nitrate solution in the infant's eyes) he is in the same complete charge of those who are present and assisting him as is the captain of a ship over all on board,* and that such supreme control is indeed essential in view of the high degree of protection to which an anæsthetized, unconscious patient is entitled,—a protection which Mrs. McConnell could justly claim in this case by reason of her trust and confidence in, and necessary reliance upon, the surgeon she employed to take care of her and her child when born.

If, then, it be true that defendant had supervisory control and the right to give orders to the interne *in regard to the very act in the performance of which the latter was negligent*, it would follow, according to the classical test of agency hereinbefore stated, that a jury would be justified in concluding that the temporary relationship between defendant and the interne was

* As to the personal liability of the captain of a vessel for negligent acts of the subordinate officers and crew, whether or not appointed or employed by him, see *Denison v. Seymour*, 9 Wend. (N. Y.) 9; *Ryall v. Kennedy*, 40 N. Y. Superior Ct. (8 Jones & Spencer) 347, affirmed 67 N. Y. 379; *Daret v. Gray*, 12 La. Ann. 394; 58 C. J. 288 [§ 400] b; Story on Agency, 9th ed. pp. 386, 387, § 314; idem, p. 388, § 316.

that of master and servant, and that consequently defendant was legally liable for the harm caused by any negligence on the part of the interne. As succinctly stated by Mr. Justice (now Chief Justice) MAXEY in *Rodgers v. Saxton*, 305 Pa. 479, 488, 158 A. 166, 169: "Responsibility is commensurate with authority". Nor is it a tenable argument that defendant should be relieved from legal responsibility because the hospital furnished the services of an interne just as it furnished the silver nitrate solution and the facilities of its laboratory and just as it furnished Mrs. McConnell with a room and board upon her payment of the hospital charges. The difference between the hospital's supplying mere mechanical implements or medicines, and its furnishing, at defendant's request, an interne to assist him in the operating room in the discharge of a duty which rested primarily on defendant's own shoulders, is obvious, because, by the interne's becoming subject to his control, he became responsible for the proper performance by the interne of all acts done in subordination to such control, whether defendant actually *exercised* it or not, and it would make no difference, in view of such control, whether the interne was furnished by the hospital or had been obtained in some other manner. As far as the evidence discloses it was defendant, not the hospital, who assigned the interne to the task of inserting the silver nitrate solution into the infant's eyes, and, even if in the performance of that act he may also have been serving the hospital, that fact would not change his legal status with respect to defendant, since a borrowed employee may, in the performance of a given act, be serving the interests of both his general employer and his temporary master.

It is urged by defendant that the rule of law in regard to a "borrowed employee" should not apply where the employee is a regular part of the personnel of a public or quasi-public hospital. But such an employee

can be temporarily detached, in whole or in part, from the hospital's general control, just as in *Siidekum, Administrator, v. Animal Rescue League of Pittsburgh*, 353 Pa. 408, 45 A. 2d 59, a policeman was held to have been borrowed from the city's police force so as to become the temporary servant of a charitable institution for the purpose of driving its truck on the particular occasion when, by his negligence, an accident occurred.

Defendant's counsel cites several cases from other jurisdictions in an attempt to show that an operating surgeon is not generally held liable for the negligence of hospital internes and nurses. In those cases,* however, the negligence on the part of the nurse or interne was in connection with the *post*-operative care of a patient, not administered in the presence or under the control of the surgeon. Plaintiffs do not contend that a surgeon's liability should apply, *after the operation is concluded*, to treatment administered by floor nurses and internes in the regular course of the services ordinarily furnished by a hospital; as to all such care and attention they would clearly be acting exclusively on behalf of the hospital and not as assistants to the surgeon. But for the period of the operation itself the situation is entirely different, and if operating surgeons were not to be held liable for the negligent performance of the duties of those then working under them, the law would fail in large measure to afford a means of redress for preventable injuries sustained during the course of such operations.

In *Jordan v. Touro Infirmary*, 123 So. 726, 730 (La.), the Court said: "As we have seen from the testimony that the nurses are absolutely under the orders of the surgeons in the operation room and in no manner con-

---

* *Covington v. Wyatt*, 196 N. C. 367, 145 S. E. 673; *Harris v. Fall*, 177 Fed. 79; *Harlan v. Bryant*, 87 Fed. (2) 170; *Hohenthal v. Smith*, 114 Fed. (2) 494; *Stewart v. Manasses*, 244 Pa. 221, 90 A. 574.

trolled by the officers of the defendant [hospital], it [the hospital] has no responsibility for the acts of the nurses. They may be considered, pro hac vice, as the servants of the surgeon."

In *Aderhold v. Bishop*, 94 Okla. 203, 206, 221 P. 752, 754, the Court stated that "While the head nurse and her assistants were the general employees of the El Reno Sanatarium, they were nevertheless, during the time required for the actual operation, under the direction and supervision of the operating surgeons, and were the servants of the operating surgeons in respect to such services as were rendered by them in the performance of the operation, and for any negligence on the part of such employees in the performance of such services the operating surgeons are liable."

In *Emerson v. Chapman*, 138 Okla. 270, 280 P. 820, it was held that where a surgeon performs an operation at a hospital, and a nurse, an employee of the hospital, is used by him to remove adhesive tape and, with a fluid, clean the body of the patient then under an anæsthetic, the surgeon is liable for any negligence on the part of the nurse in applying the fluid for the reason that she was then under the immediate supervision and control of the operating surgeon.

In *Davis v. Potter*, 51 Ida. 81, 2 P. 2d 318, it was held that where the evidence disclosed that the surgeon supervised the placing of a patient in bed in the hospital after an operation, he was liable for the negligence of a nurse which resulted in the patient being burned by a hot water bottle which the nurse had placed there. In that case the surgeon obviously extended the period during which his responsibility continued by assuming the duty of conveying the patient from the operating room to her own room and there seeing that she was placed safely in bed.

In *Simons v. Northern Pacific Rwy. Co.*, 94 Mont. 355, 366, 367, 22 P. 2d 609, 613, the Court said: "The

mere fact that an assistant to a physician or surgeon is himself, or herself, a member of the same or a similar profession, does not take the employer and employee out of the operation of the rule of respondeat superior. . . . Where a physician retains complete control . . . but delegates to another the manual administration of the prescribed treatment, the relation of principal and agent exists, whether the person administering the treatment be a layman, a physician, or a nurse." . . .

In *Ales v. Ryan,* 8 Cal. 2d 82, 105, 64 P. 2d 409, 420, it was said: "The surgeon in absolute charge of and who is directing the operation [performed by him at a hospital] . . . is responsible for the negligent act of the assistant [a nurse who was an employee of the hospital] in failing to remove a sponge from the abdomen."

In *Ybarra v. Spangard,* 25 Cal. 2d 486, 492, 154 P. 2d 687, 690, the Court stated that "In this connection, it should be noted that while the assisting physicians and nurses may be employed by the hospital, or engaged by the patient, they normally become the temporary servants or agents of the surgeon in charge while the operation is in progress, and liability may be imposed upon him for their negligent acts under the doctrine of respondeat superior. Thus a surgeon has been held liable for the negligence of an assisting nurse who leaves a sponge or other object inside a patient, and the fact that the duty of seeing that such mistakes do not occur is delegated to others does not absolve the doctor from responsibility for their negligence." . . .

In the present case the court erred in entering a nonsuit. It is for the jury to determine whether the relationship between defendant and the interne, at the time the child's eyes were injured, was that of master and servant. If such was the relationship, defendant is legally liable for the injury caused by the interne's alleged negligence. In determining whether the interne *was* defendant's servant at that time, the mere fact that he was then in the *general* employ of the hospital would

not prevent the jury from finding that he was also at that same time the servant of defendant if he was then subject to his orders in respect to the treatment of the child's eyes with the silver nitrate solution.

Order reversed and record remanded with a procedendo.

DISSENTING OPINION BY MR. JUSTICE ALLEN M. STEARNE:

The majority decide that a senior staff surgeon of a charitable hospital's obstetrical department who delivered a child of his private patient in the hospital is *personally* liable in damages for an injury to the child caused by the alleged negligence of a *hospital intern*, a part of the hospital staff,—an individual whom the surgeon neither hired nor paid and could not discharge.

In the opinion it is said that counsel for both plaintiffs and defendant agree that there is no exact precedent in Pennsylvania and little, if any, in other jurisdictions. It is also stated: *"However, the general principles applicable to the situation are not only clear, but so firmly established that there is no need to explore any new and hitherto uncharted pathway in the law."* With this statement I am in complete disagreement. The majority misconceive the functions and duties of a *charitable hospital*—respecting its staff, personnel and equipment—*when its facilities are made available to one of its staff surgeons who operates, in the hospital, on one of his private patients.* They commence with a *false premise,* upon which they have erected an erroneous hypothesis. It is assumed that a *charitable or public hospital* has the same attributes that would exist if the surgeon conducted a *private hospital,* where the doctrine of *respondeat superior* would apply. A private hospital, however, is operated *for profit* and consequently the owners are responsible for the negligence of their servants and agents as they would be if engaged

in any other business enterprise. Because the *staff* surgeon operates on his private patient in a *charitable* hospital for a fee, the majority erroneously decide that when a *hospital intern* assists in such an operation, the public hospital "lends" the intern (as well as all the hospital equipment and personnel) to the surgeon, who *"borrows"* from the charitable hospital *for the surgeon's private gain.* This is a false assumption. There can be no "lending" or "borrowing" where a charity is involved. Such a transaction would be illegal. All assets of a charitable hospital are held *in trust* and must be employed solely for the purposes donated. Trust funds may not be *given away.* Furthermore, charities are not liable for the torts of their employes. Cf. *Fire Insurance Patrol v. Boyd,* 120 Pa. 624, 15 A. 553, and the many cases following it; *Brindle Will,* 360 Pa. 53, 63. It is clear to me that trust property or the paid personnel of a charitable hospital may not be *loaned* to a private individual to enable him to make a *private gain.*

The majority mistakenly hold the surgeon liable for the hospital intern's negligence because the intern was subject to the *orders and directions* of the surgeon who, it is said in the opinion, ". . . *is in the same complete charge of those who are present and assisting him as is the captain of a ship over all on board. . . .*", which principle may apply under maritime law.

In my view the majority fail to distinguish the difference in the status of a surgeon operating in his own *private* hospital and where, as a member of the surgical staff, he is permitted to operate, for a fee, on a private patient in the *public* hospital. When a *private patient* enters a *public* hospital the patient necessarily has made two contracts: (1) with a hospital *staff doctor* for the patient's treatment and (2) with the *hospital* itself for the furnishing of the hospital's facilities which include the intern as well as the other employes.

A hospital staff doctor is one who is selected by the governing body of the hospital and is granted *hospital* privileges. Such a doctor gives his services without compensation to ward or free patients and is permitted to attend, in the hospital, private patients *on a fee basis.* See MacEachern, Hospital Organization and Management, Physicians' Record Co. (1935). There is no difference in hospital maintenance and treatment between free and paid patients. A free patient, in a ward, receives the same food, care, and medical and surgical service which is supplied to a private patient. A free patient, however, may not *select* any staff doctor he chooses. He is required to accept the assignment of the hospital medical or surgical staff. A private patient, who pays, is granted the privilege of selecting, *from the staff*, the doctor or surgeon he desires. He also enjoys the privacy and comfort of a private room— graded as to price according to its location, size and furnishings.

Counsel for plaintiffs reflects the mistaken idea that a staff surgeon who operates on a private patient in a hospital for a fee has the entire facilities of the hospital placed at *his* disposal for *his* profit. Counsel said in the lower court (p. 52a): *". . . these [patients] are sent to the hospitals for the convenience of the doctor and not because the [patients] want to go there."*

This is an erroneous assertion. Patients are NOT sent to hospitals for the convenience of doctors. True, doctors may *prefer* the attention and security of hospital care but this is *for the benefit of the patients.* To enter a modern hospital as a patient is definitely to his safety, comfort and advantage. It is a matter of judicial knowledge, and medical history, that, as late as the preceding generation, before modern efficient hospitalization was available, the family doctor frequently employed the patient's *kitchen* both as a delivery and operating room. In a difficult obstetrical case, the *ironing board* was improvised as a *delivery table* while

the kitchen table served for an *operation*. In a modern hospital every known facility and equipment is supplied at enormous cost for the benefit of *both* free and pay patients.

A modern public hospital is a well organized and efficiently operated institution. Both its *business* and professional organizations are highly developed. Not only does the hospital care for the sick and injured, but is required by law to assist in the *education* of physicians, nurses and other personnel. The hospital is conducted by professional chiefs of departments, assistant chiefs, resident physicians, interns, dietitians, nurses (graduate and student), orderlies and corps of other efficient and necessary personnel.

It is a matter of judicial knowledge that in all *public* hospitals—whether operated or subsidized by federal or state government, church, fraternity or community, where free patients are received and treated, and where paid patients are also admitted—*the revenue derived from private patients always proves insufficient to meet the operating expenses of the hospital.* The government, church, fraternity, community or charitable-minded organizations or individuals are required to meet, or assist in meeting, operating deficits. *Private patients, as well as ward patients, in public hospitals, are to a graduated degree beneficiaries of charity.* Ward patients in state aided hospitals are required to pay, when able, to the extent of their ability.

*Hospital interns* are required by statute to serve an apprenticeship in an accredited hospital after graduation from a medical school before they become eligible to obtain a license to practice medicine and surgery. The statutory requirements are set forth in Section 5 of the Act of June 3, 1911, P. L. 639, as amended, 63 P.S. 405. Under this Act no person is entitled to a license to *practice medicine or surgery* unless he possesses named educational qualifications; is a graduate

of a credited medical school ". . . . and shall have completed not less than one year as intern in an approved hospital which shall have at least twenty-five beds to each intern devoted to the treatment of medical, surgical, gynecological, and special diseases; shall maintain or establish cooperation with a maternity department or hospital, in which each intern shall have not less than six weeks service; or the equivalent thereof. . . ."

In compliance with this Act, the Pennsylvania Department of Public Instruction, Bureau of Professional Licensing, State Board of Medical Education and Licensure, issued (as a public record) in May, 1941, Bulletin No. 625. It is stated therein that the service of an intern is required to be a *"rotating"* one with diversity of work—including maternity—the object being *that the intern receives an adequate apprenticeship training in each department.* It is also stated in the State Bulletin: *". . . the hospitals of the Commonwealth of Pennsylvania have become a part of the teaching system of medicine and surgery. . . ."* The duties of an intern in the Obstetrical Department are given in detail and need not now be recited. It will suffice to state that, in general, *the intern is required to be given, in the hospital, practical experience and instruction in medicine and surgery in order to enable him to practice as a physician and surgeon.*

It is not contended that had this defendant surgeon been operating upon a *free patient,* he would have been *personally* liable for the negligence of the hospital intern. The liability here imposed is based upon the *contractual* relation between the surgeon and his patient. It is my view that when the patient contracted for her admission into the *public* hospital and engaged all its facilities for *her own* benefit, safety and comfort, and employed one of the hospital's staff surgeons to perform the operation, it was *the patient herself* who placed the facilities of the hospital *at her surgeon's*

*disposal.* True, she paid the hospital staff surgeon a fee, but she was still the *hospital's patient,* paying for the hospital facilities furnished, and was required to abide by all the rules of the hospital. The majority, on the contrary, decide that the contract with the hospital's staff surgeon *placed the entire personnel of the hospital under the surgeon's direction and control,* thereby constituting all of them his servants and agents. *True, the majority appear to limit this liability to negligence of hospital employes only when the surgeon is personally present,* that is, present in the same operating room, even though he is unaware of the occurrence of the alleged negligence. Such a limitation is illogical and reveals what I consider an arbitrary and unreasonable imposition of liability. *If* it is true, as averred in the statement of claim, that the surgeon was to include the care of the mother "during her pregnancy and to deliver her of her expected child, and to care for both mother and child at said time of delivery and convalescence" or as is said in the opinion ". . . until [the child] was turned over to the family physician," according to the theory of the majority *the entire personnel of the hospital necessarily became the servants and agents of the surgeon during this period—not only in the operating room but in every department of the hospital where its service touched the patient.* An absurd result would logically follow: the surgeon could become liable for the negligence of the chauffeur who drives the patient to the hospital in the ambulance; for the elevator operators; the nurses (private, floor and student); resident physicians; interns; anesthetists; orderlies and all of the employes of the hospital whose service is available to his private patient. Another absurd result would necessarily follow. Not only was the *personnel* placed at the surgeon's service but the *equipment* as well. If the rule of the majority is adopted the surgeon, by the use of the hospital equipment, becomes *personally* re-

sponsible for its condition and maintenance. He would owe the duty to his patient to *inspect and keep in repair* the ambulance, the elevators, the operating room equipment and every mechanical tool, object and device employed in the care and treatment of the patient.

The correct view, in my opinion, is that succinctly stated by counsel for defendant in his brief (p. 5): ". . . when a patient enters a hospital for a surgical operation the services to be rendered are partly to be rendered by the surgeon and partly by the hospital. The contract between the patient and the hospital covers the services to be rendered by it. The contract with the surgeon covers the services to be rendered by him." This suit is really an attempt to make the *surgeon* responsible for the service rendered by the *hospital.*

The charitable hospital, where this Cæsarian operation was performed, is the Jewish Hospital of Philadelphia. It is a corporation of the first class not for profit, founded and conducted by charitable-minded public-spirited citizens of the Jewish faith, as a public hospital open to all irrespective of race, color or religious affiliation. It is supported entirely by fees from paying patients, by donations from religious and charitable organizations, individual beneficences and other charitable means. Its functions, in common with all public hospitals, are (1) care of the sick and injured and (2) education of physicians, nurses and other personnel. Defendant, one of its staff surgeons, suggested to his patient the use of this hospital. The patient agreed. She caused arrangements to be made for her entry into the hospital and for the payment of the use of all the hospital facilities. When the time arrived (while the patient was in the hospital) for a necessary Cæsarian section, the surgeon, in arranging for the operation, requested an intern named Davidson to assist him at the operation fixed for the following morning. Dr. Davidson told the surgeon that he was no longer on

that service but that Dr. Conston was. The surgeon then requested Dr. Davidson to inform Dr. Conston (the intern *then* on that service) to be present next morning to assist in the operation.

*I strongly disagree that this conversation constituted a selection by the surgeon of the intern "whom [the surgeon] had designated."* Under the state law requiring the rotating of interns, this was the *then* current rotating service of Dr. Conston. That duty was NOT performed at the *request of and for the sole benefit of the surgeon. It was a part of the standard requirements of hospital service.*

The defendant-surgeon, called as if under cross examination, and whose *uncontradicted* testimony must be accepted as true (*Steffenson v. The Lehigh Valley Transit Company,* 361 Pa. 317, 64 A. 2d 785, and cases therein cited), testified (p. 39a): "A. . . . The child was delivered through an incision made in the anterior abdominal wall and into the uterus. The child was withdrawn from the uterus. The cord was clamped with two clamps. Q. That was by you? A. Yes, and cut between, and then the child was handed to one of the resident physicians to take to a table near by and to tie the cord and treat the eyes while I continued to treat the patient. Q. Were you in any position because of the condition of the mother patient to have given any personal attention to the child at that time? A. No, I wasn't, because during the operation when the afterbirth had separated and was being delivered Mrs. McConnell bled profusely. She bled too freely. She had a hemorrhage from the side where the placenta or afterbirth was inserted against the wall of the uterus, and it was necessary for me in stopping that hemorrhage to pack the uterus with gauze and then continue to suture the uterus together, close the incision, and to close the incision in the abdominal wall. During that time I was too busy to prevent further hemorrhage and taking care of her to pay

any attention to the baby at the side table. Q. Now, this job of putting drops of silver nitrate in the baby's eyes, is it or is it not a job which requires any special skill? A. It is done by midwives, nurses, students, physicians. and even those who are not educated in medicine in any way."

Also, p. 40a: "At the time of a Cæsarian Section it is the universal custom in the Philadelphia Hospitals that the baby is handed to an intern who with the assistance of a nurse ties the cord and puts drops in the baby's eyes."

We have then the uncontradicted fact, binding the plaintiffs, that while the entire and undivided attention of the surgeon was thus necessarily centered upon the mother and during an obvious emergency (24a) the baby was handed to the intern by the operating surgeon. The intern asked the "supervisor", *a graduate nurse*, to hand him the silver nitrate. (By the Rules and Regulations of the Pennsylvania Department of Health authorized by the Act of June 7, 1923, P. L. 498, a solution of silver nitrate is required to be instilled in each eye of a newborn child.) The nurse handed the intern a glass container of this solution, with a syringe, prepared and supplied by the hospital. It is charged (and for the present purpose it must be assumed) that the intern negligently instilled too great a quantity of the solution into the eyes of the infant and failed to properly irrigate them, causing a silver burn which ultimately resulted in the removal of the right eye.

I shall not attempt to analyze the various cases from other jurisdictions cited in the majority opinion. For the reasons given above, I cannot see the difference between the negligence of a hospital employe in *post*-operative care and negligence during the *operation*. If the intern is "borrowed" and thus became the surgeon's servant, that relation necessarily continued, under the contract, "until the baby was turned over to the family

doctor." *Stewart v. Manasses*, 244 Pa. 221, 90 A. 574, ought to be adopted as the rule of this case. This Court would have imposed liability in that case *if* the nurse had been a servant of the doctor, as the majority's theory would necessarily imply. But it did not. We decided that the *surgeon* was NOT liable for the negligence of the nurse in wrongfully applying a hot water bottle.

No one questions that a servant may be employed by two masters. But in *Südekum v. Animal Rescue League of Pittsburgh*, 353 Pa. 408, 45 A. 2d 59, the city Policeman who was driving the "dog-catcher's truck" which caused the accident, was in fact working *as a policeman* in the interest and employ of the city. The city employed the League to help it rid the city of stray dogs. Anyone who has observed the operations of dog-catchers will fully appreciate the necessity of the use of policemen when operating in certain sections of a community. That case, and its principles, do not govern the present case.

It is crystal clear to me that *when* this staff surgeon used the services of an intern of a public hospital—a member of the hospital's personnel, supplied, trained and paid by the hospital and whom the surgeon was required to use—the surgeon was *not* dealing with his *own* servant or agent but with that of the hospital, supplied at the direction and cost of the patient, *for the use of her own doctor,* the staff surgeon. A direction or order of such a surgeon, *under those circumstances,* is quite different from that of a surgeon who is conducting his own private hospital for profit, where he becomes the master of all persons employed by him and for whom, in consequence, he assumes an employer's responsibility.

I would affirm the entry of this nonsuit.