

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN, TEXAS 78711

WAGGONER CARR
ATTORNEY GENERAL

December 30, 1966

Honorable Robert H. Shipman
President, Texas State Board
  of Examiners in Optometry
217 Three American Life Bldg.
San Antonio, Texas

Opinion No. C-795

Re: Construction of the
phrase used in Article
4565d and 4565g, V.C.S.
"the fitting of contact
lenses shall be done only
under the direct super-
vision of a licensed
physician or licensed
optometrist as defined
by the laws of this
State."

Dear Dr. Shipman:

     We are in receipt of your recent letter requesting an
opinion concerning the legality of permitting an ophthalmic
dispenser, who is unlicensed under the law, to fit contact
lenses under the facts stated in your letter.

     Your letter specifically directs our attention to
Articles 4552, 4565d and 4565g, Vernon's Civil Statutes,
and reads in part as follows:

> ". . . In both Articles 4565d and 4565g,
> as a proviso, appears the requirement that
> the fitting of contact lenses shall be done
> only under the direct supervision of a licensed
> physician or licensed optometrist as defined
> by the laws of this State. In Article 4565d
> there appears as a proviso to the definition
> of optometry contained in Article 4552, a
> phrase stating, in pertinent part, the making
> of any measurement whatsoever involving the
> eyes or the optical requirements thereof
> constitutes the practice of optometry,
> but permitting to unlicensed persons such
> as ophthalmic dispensers, the measuring
> of interpupillary distances and making

-3823-

facial measurements in the course of
dispensing or adapting ophthalmic
prescriptions in accordance with the
specific directions of such a pre-
scription, but thereafter setting out
contact lenses in the quoted proviso
as a special case. The proviso occupies
a similar position in Article 4565g.

"Owing to the heavy and increasing
demand for contact lenses on the part of
the public generally and the Texas public,
our and your particular concern, the proper
application, interpretation and enforcement
of the quoted statutes is becoming a matter
of great and increasing public interest and
concern. As you know, our Board is charged
with responsibility of administering the
Optometry Act, from which the above quoted
statutes come, and is charged with the power
and duty to do so by injunction or other
appropriate remedy.

". . . In connection with the Board's
duties, numerous and increasing instances
have come to our attention in which ophthal-
mic dispensers have, in connection with
dispensing more or less complete prescrip-
tions, engaged in measurements of the
curvature of the cornea, and in other highly
delicate procedures in fitting contact lenses,
out of the actual presence of a licensed
optometrist or physician. In addition, the
practice seems to be widespread and growing
whereby a prescription is simply furnished
a dispenser, and he completes the fitting
of the contact lens from this point, con-
ducting additional measurements, physically
fitting the lenses-including inserting them
in the patient's eye-instructing the patient
in insertion and removal of the lenses, and
allied procedures."

Specifically you ask whether activities of an unlicensed ophthalmic dispenser as set out in the following examples are lawful:

"(a) Dr. Jones, a licensed physician or optometrist, has his office on the 10th floor of the X building. Mr. Smith, an unlicensed ophthalmic dispenser, has his office in another building some five blocks away. The offices have no common ownership and are distinct entities. Dr. Jones, after examining the patient at his (Jones') office, sends him to Mr. Smith, the dispenser, with a written prescription signed by Jones for contact lenses which contains the refractive correction desired, and nothing more. Mr. Smith, at his (Smith's) office, thereafter, and over the course of one or more visits by the patient, use an ophthalmometer to measure the curvature of the patient's cornea, helps the patient select the type and color of the lenses, makes several trial insertions and placements of different sized and shaped lenses on the eyes of the patient, performs the fluorescein test and the other indicated procedures, and advises the patient in the matter of inserting the lenses and to return to him, Smith, for any corrections; in determining the lens initially selected Smith observes the physical effect on the eye of the various trial lenses and also evaluates the subjective statements of the patient. During all the activities described in the foregoing sentence Dr. Jones is in his (Jones') office.

(i) Assume the same situation as in (a) above except only that Smith, at the end of all the above described measuring and fitting processes, and after he has selected the lens which seem appropriate to him, directs the patient to return not to him, but instead to Dr. Jones for Dr. Jones' checking of the selection and fit of the lenses, and the patient does in fact return to Dr. Jones; Dr. Jones requires this "return" visit to him in all cases.

(ii)  Same situation as in (i) above except Dr. Jones' prescription includes the measurements of the curvature of the cornea.

(b)  The situation is the same as in paragraph (a), except that Smith's office is on the floor below that of Dr. Jones, and in the same building."

Article 4565d, Vernon's Civil Statutes, reads:

"For the purpose of this Act the words 'and fitting lenses or prisms,' as employed in Article 4552, shall be construed to include:

"(1)  Prescribing or supplying, directly or indirectly, lenses or prisms, by the employment of objective or subjective means or the making of any measurements whatsoever involving the eyes or the optical requirements thereof; provided, however, that nothing in this Act shall be construed so as to prevent an ophthalmic dispenser, who does not practice optometry, from measuring interpupillary distances or from making facial measurements for the purpose of dispensing, or adapting ophthalmic prescriptions or lenses, products and accessories in accordance with the specific directions of a written prescription signed by a licensed physician or optometrist; provided, however, the fitting of contact lenses shall be done only under the direct supervision of a licensed physician or licensed optometrist as defined by the laws of this state.

"(2)  The adaption or supplying of lenses or prisms to correct, relieve or remedy any defect or abnormal condition of the human eye or to correct, relieve or remedy or attempt to correct, relieve or remedy the effect of any defect or abnormal condition of the human eye.

"(3)  It shall be construed as a vio-
lation of this Act for any person not a
licensed optometrist or a licensed physician
to do any one thing or act, or any combination
of things  or acts, named or described in this
article."  (Emphasis supplied)

Article 4565g, Vernon's Civil Statutes, in part reads:

"Nothing in this Act shall be construed
so as to prevent an ophthalmic dispenser, who
does not practice medicine or optometry as
defined by the laws of this State, from pre-
paring, filling, duplicating, compounding or
adapting ophthalmic prescriptions, dispensing
ophthalmic lenses, products and accessories,
in accordance with the specific directions of
a prescription written and signed by a licensed
physician or optometrist; provided, however,
the fitting of contact lenses shall be done
only under the direct supervision of a licensed
physician or a licensed optometrist as defined
by the laws of this state. . . ." (Emphasis
supplied)

While optometrists are excluded from the purview of
the enactment that regulates the practice of medicine, "the
fitting of contact lenses" was expressly made a qualified
right and the statutes impose responsibility upon the licensed
physician or licensed optometrist to superintend this act
"directly".  45 Tex.Jur.2d 170-171, Physicians and Other
Healers, Sec. 32.

Article 4552, Vernon's Civil Statutes, defining the
practice of optometry, and Article 4510, Vernon's Civil Statutes,
defining the practice of medicine, are to be read in pari materia
with the above mentioned statutes.  53 Tex.Jur.2d 280, Statutes,
Sec. 186.

Article 4552, Vernon's Civil Statutes, states:

"The practice of optometry is defined to
be the employment of objective or subjective
means, without the use of drugs, for the pur-
pose of ascertaining and measuring the powers

of vision of the human eye, and fitting lenses or prisms to correct or remedy any defect or abnormal condition of vision. Nothing herein shall be construed to permit optometrists to treat the eyes for any defect whatsoever in any manner nor to administer nor to prescribe any drug or physical treatment whatsoever, unless such optometrist is a regularly licensed physician or surgeon under the laws of this State. . . ."

Article 4510, Vernon's Civil Statutes, provides as follows:

"Any person shall be regarded as practicing medicine within the meaning of this law:

"(1) Who shall publicly profess to be a physician or surgeon and shall diagnose, treat or offer to treat, any disease or disorder mental or physical, or any **physical deformity** or injury by any system or method, or to effect cures thereof: (2) or who shall diagnose, treat or offer to treat any disease or disorder, mental or physical or any physical deformity or injury by any system or method and to effect cures thereof and charge therefor, directly or indirectly, money or other compensation; . . ."

It is thus seen that while the ophthalmic dispenser is given the right of manufacturing lenses or prisms according to the specifications prescribed by the licensed physician or optometrist, the fitting of the contact lenses on the patient must be "directly supervised" by the licensed physician or optometrist. This is but a recognition that improper fitting is likely to cause injury to the eyesight and must not be performed without the knowledge and skill of a licensed practitioner.

You have referred us in your letter to the statement in 17 American Jurisprudence, Proof of Facts, Optometric Malpractice, Contact Lenses, Section 23, concerning a method or process of prescribing and of fitting contact lenses. A member of the Texas State Board of Examiners in Optometry

has also invited our attention to another method or process
for fitting or prescribing contact lenses which involves
the extensive use of the ophthalmometer.  We do not consider
the differences in the methodology and prescription to be
of material significance to the questions before us, since
in our opinion both procedures constitute the fitting of
contact lenses as contemplated by Articles 4565d and 4565g.

An enlightening article, "Complications of Corneal
Contact Lenses," 1963 Insurance Counsel Journal, published
by International Association of Insurance Counsel, Vol. 30,
No. 3, pages 456, 459-460, a reprint with the permission of
the Southern Medical Journal, August 1962, discusses the
severe complications often resulting from "improper fitting
and improper follow-up of the corneal contact lenses,"
which are said to result from "many poorly trained and impro-
perly motivated technicians," and it was concluded by the
author, Dr. Thomas S. Edwards:

> ". . . The more important complications
> are brought about by nonperfect fitting of
> corneal contact lenses. . . .It is thought
> that the fitting of these contact lenses
> requires that the patient have close super-
> vision and examination by a competent
> ophthalmologist in order to pick up these
> complications early and to secure the most
> perfect fit possible of the corneal contact
> lenses.  This is one aspect of medicine.
> . . which cannot be delegated to improperly
> trained and improperly motivated technicians,
> especially the technicians who are poorly
> trained and not supervised by any ophthalmolo-
> gist at all."  (Emphasis supplied)

In accord, Archives of Ophth., Vol. 65, p. 161, 1961,
by H. F. Allen, "The Contact Lens Gap-Delegation or Default?"

The authorities are harmonious in holding that the
taking of any measurements of the cornea or eye, other than
the mere measurement of interpupillary distances, constitutes
the practice of optometry and medicine, and requires the
direct personal supervision of one licensed to practice.

State ex rel Reed v. Kuzirian, 228 Ore. 619, 365 P2d 1046 (1961), 88 A.L.R.2d 1284, holding that the fitting of glasses required professional skill and judgment and judgment and distinguishing "between a nurse, who has professional skill in her own right, and an optician who, as far as the law is concerned, needs none" 1/; Ketring v. Sturges, 372 S.W.2d 104 (Mo. 1963); New Jersey State Board of Optometrists v. Reiss, 83 N.J. Super. 47, 198 A.2d 816 (1964), in which it was held as follows:

> "There is a self-evident distinction between the mechanics of making conventional eyeglasses and their adjustment to the face and the fabrication of contact lenses and the fitting of them directly to the eyes. The latter, unlike the former, involves a direct exposure to possible eye injury and require professional skill and judgment. The character, intensity and severity of ocular damage resulting from the improper fitting of contact lenses has general recognition . . .
>
> "It is no defense that Reiss possessed a doctor's prescription and that his work had been pronounced satisfactory by the ophthalmologist after a wearing time of several weeks. The crucial period requiring professional supervision was at the time of the adaptation of the lenses, their initial adjustments . . . ."

Realizing the danger which inhers in the fitting of contact lenses to the eyes, the Legislature intended, by the use of the words "direct supervision", to require that a licensed physician or licensed optometrist be actually present to control and supervise the details and technique

---

1/ This is true in Texas, since nurses are licensed while there is no licensing or control of any kind of ophthalmic dispensers.

of fitting contact lenses. This is the only reasonable interpretation of the language used and is fully supported by the authorities defining these terms. Sec. 83 C.J.S. 899, "Supervise," and 12A Words and Phrases 352, "Supervision;" Webster's New International Dictionary (2d Ed. 1954), "Direct"; State Ex. Rel Coleman v. Christmann, 6 Ohio Law Abstract 212 (Ohio Appeals 1927); Soeder v. State, 14 Ohio Law Abstract 212 (Ohio Appeals 1933); State v. Collins, 159 N.W. 604 (Iowa 1916); James v. Dental Commissioner of Conn., 145 Atl. 570 (1929).

We do not think it can be reasonably contended that the Legislature intended that the ophthalmic dispenser, in the fitting of contact lenses, could act in an independent contractor relationship with the licensed practitioner. Such a relationship would result in the licensed practitioner having no control over the dispenser's manner of doing the work and no right to supervise its means, methods or details. 2 Tex.Jur.2d 439, Agency, Sec. 5; Shannon v. Western Indemnity Co., 257 S.W. 522 (Tex.Comm.App. 1924). This concept is necessarily inconsistent with "direct supervision" by the licensed practitioner over the ophthalmic dispenser. In the fitting of contact lenses, the relationship between the ophthalmic dispenser and the licensed practitioner is analogous to the relationship of a nurse to a doctor during an actual operation when performing under this actual supervision and control. In such a case, the nurse is no longer an independent contractor, but becomes a borrowed servant, whose negligence is imputed to the doctor. McConnell v. Williams, 361 Pa. 355, 65 A.2d 243 (1949); Aderhold v. Bishop, 94 Okl. 203, 221 Pac. 752 (1923), 60 A.L.R. 137, 143; Sherman v. Hartman, 290 P.2d 894 (1955); Hallian v. Prindle, 62 P.2d 1075, 1077 (1936).

In each of the instances about which you have inquired, the ophthalmic dispenser would be engaged in the process of fitting contact lenses. It is our opinion that the ophthalmic dispenser may not fit contact lenses in any of these situations because he is not acting under the direct supervision of a licensed physician or optometrist as contemplated and intended by the Legislature. The statutes direct in clear and unambiguous language that the unlicensed dispenser shall perform the act of fitting of contact lenses only under the "direct supervision" of a licensed physician or licensed optometrist. The statutes, being in the exercise of the police power of the state and for the protection of the public health and

welfare, are mandatory and must be construed strictly in the light of the purposes of their enactment. 70 C.J.S. 823-825, Physicians and Surgeons, Section 3(b).

Since the duty of direct supervision and control requires presence, we conclude that the statutory duty of the licensed practitioner is not delegable to the unlicensed dispenser. Therefore, it is a violation of the statutes in question to permit the ophthalmic dispenser to fit the contact lenses under the fact situations inquired about.

### S U M M A R Y

Articles 4565d and 4565g, V.C. S., require that the fitting of contact lenses be done only under the direct supervision of a licensed physician or licensed optometrist. Under the facts inquired about, the ophthalmic dispenser may not lawfully fit contact lenses.

WAGGONER CARR
Attorney General of Texas


By: Kerns B. Taylor
Kerns B. Taylor
Assistant

KBT:mks

APPROVED:
OPINION COMMITTEE

W. O. Schultz, Chairman

Gordon Cass
James McCoy
Pat Bailey
John Reeves

APPROVED FOR THE ATTORNEY GENERAL
BY: T. B. Wright