## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 94-CA-00320-SCT

*SHARILYNN STARCHER AND ELTON STARCHER*

*v.*

*DR. DAVID BYRNE*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/24/94 |
| TRIAL JUDGE: | HON. JAMES E. THOMAS |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | JOHN D. GIDDENS |
| ATTORNEYS FOR APPELLEE: | HARRY R. ALLEN |
| | RODNEY D. ROBINSON |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 1/30/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 2/20/97 |

**BEFORE SULLIVAN, P.J., SMITH AND MILLS, JJ.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. Sharilynn Starcher and her husband Elton, appeal a jury verdict from the Circuit Court of Harrison County, First Judicial District, denying relief for injuries stemming from an adverse reaction to the induction of anesthesia from which Sharilynn Starcher suffered brain damage. The Starchers charge that: (1)the jury verdict for the operating physician was against the overwhelming weight of the evidence; (2) that the court should have ruled that the operating physician was liable under either (a) the borrowed servant doctrine or (b) the "captain of the ship" doctrine; and (3) the trial court erred in not granting a jury instruction as to the doctor's negligence in the failure to follow guidelines for the administration of anesthesia. This Court affirms the verdict of the jury. Furthermore, we hold that the borrowed servant doctrine is not applicable in this case; that the "captain of the ship" doctrine is not well-suited to this case; and that there was no error in the trial court's refusal to give the requested jury instructions.

### FACTS

¶2. Sharilynn Starcher was admitted to Gulf Coast Medical Center on September 18, 1988 for elective surgery to correct a ventral hernia which was to be performed by the defendant, Dr. David Byrne. The surgery was unsuccessfully attempted the next evening. The regular anesthesiologist, Dr.

Jack Coursey, was not present to begin the anesthesia process. In his stead was Nurse William Wright, a certified registered nurse anesthetist (CRNA) and an employee of Dr. Coursey. Testimony elicited at trial showed that: Dr. Byrne was not Wright's supervisor; Dr. Byrne had little, if any say over the anesthesia process and was not expected to inject himself into the anesthesia process; Dr. Byrne could not definitively tell Wright what to do and expect that Wright would obey those commands if Wright thought that Dr. Byrne was wrong; it is not at all unusual for a CRNA to perform the anesthesia for surgical procedures in the total absence of an anesthesiologist so long as a physician is available in case of an emergency, and CRNAs in this state are trained to do so.

¶3. At the beginning of the anesthesia induction process, Dr. Byrne received an emergency page concerning another surgery that he had completed earlier that day on another patient. He went into the hallway to answer that page while the anesthesia process was being completed. The hallway was, of course, outside the operating room, but was within the operating suite and only about thirty feet from the operating room door. The operating suite is the area consisting of all the operating rooms as well as the doctors' lounge and scrub room. It was the hospital policy at that time that the surgeon was not expected to be in the operating room, but only had to be in the operating suite at the time that the anesthesia process began. After completing the telephone call, Dr. Byrne returned to the operating room where he noticed that there was a problem with the anesthesia induction. Dr. Byrne and Nurse Wright determined that Sharilynn was suffering from a bronchospasm, which is a constriction of the muscles of the throat that makes the passage of air to and from the lungs very difficult. Based on their diagnosis, the operating team conducted emergency treatment for a bronchospasm. Due to the patient's condition, her heart rate began to fall rapidly. It is the testimony of all persons present that Dr. Byrne administered Epinephrine, a drug which raises the heart rate and relaxes muscles, to counteract both the constricted throat muscles and the falling heart rate, although no notation was made in the hospital records to that effect. Dr. Byrne successfully administered CPR to Sharilynn Starcher at which time she was stabilized. As a result of her inability to breathe and the failure of her heart to adequately pump blood to all regions of her body, specifically her brain for several minutes, Sharilynn suffered brain damage resulting in decreased intellectual and physical capacity. She remained comatose for several days following this incident.

## STANDARD OF REVIEW

¶4. The standard of review for jury verdicts in this state is well established. Once the jury has returned a verdict in a civil case, we are not at liberty to direct that judgment be entered contrary to that verdict short of a conclusion on our part that, given the evidence as a whole, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could have found as the jury found. ***Junior Food Stores, Inc. v. Rice***, 671 So. 2d 67, 76 (Miss. 1996); ***Bell v. City of St. Louis***, 467 So. 2d 657, 660 (Miss. 1985). Our standard for review is *de novo* in passing on questions of law. ***Mississippi Farm Bureau Casualty Ins. Co. v. Curtis***, 678 So. 2d 983, 987 (Miss. 1996); ***Seymour v. Brunswick Corp.***, 655 So. 2d 892, 895 (Miss. 1995).

## ISSUES

¶5. The Starchers cite four primary issues for appeal:

### I. WHETHER THE JUDGMENT BELOW IS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE IN NOT HOLDING THAT DR. BYRNE WAS

**NEGLIGENT.**

**II. WHETHER DR. BYRNE IS LIABLE AS A MATTER OF LAW UNDER THE BORROWED SERVANT RULE.**

**III. WHETHER DR. BYRNE IS LIABLE AS A MATTER OF LAW UNDER THE "CAPTAIN OF THE SHIP" DOCTRINE.**

**IV. WHETHER THE TRIAL COURT ERRED IN FAILING TO GRANT PLAINTIFF'S JURY INSTRUCTIONS.**

<u>**DISCUSSION OF LAW**</u>

**I.**

**WHETHER THE JUDGMENT BELOW IS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE IN NOT HOLDING THAT DR. BYRNE WAS NEGLIGENT.**

¶6. In order to establish a *prima facie* case for medical malpractice, the Starchers must prove the following: (1) The existence of a duty on the part of Dr. Byrne to perform to a specific standard of conduct for the protection of others against unreasonable risk of injury; (2) Failure on the part of Dr. Byrne to conform to that standard; (3) Breach of that duty by the defendant was a proximate cause of Sharilynn's injury; (4) Injury to the Sharilynn's person. ***Burnham v. Tabb***, 508 So. 2d 1072, 1074 (Miss. 1987).

¶7. Physicians in this state are under the general duty to employ reasonable and ordinary care in the treatment of their patients. ***Drummond v. Buckley***, 627 So. 2d 264, 268 (Miss. 1993). That duty is commonly stated as follows**:**

> Given the circumstances of each patient, each physician has a duty to use his or her knowledge and therewith treat through maximum reasonable medical recovery, each patient with such reasonable diligence, patience, skill, competence, and prudence as are practiced by minimally competent physicians in the same specialty or general field of practice throughout the United States, who have available to them the same general facilities, services, equipment, and options.

*Id.; Palmer v. Biloxi Regional Medical Center,* 564 So. 2d 1346, 1354 (Miss. 1990).

¶8. The Starchers contend that Dr. Byrne was negligent because he was not present in the operating room at the induction of anesthesia by Nurse Wright. They contend that the Mississippi Standards of Practice for Nurse Anesthetists require that a CRNA must work under the direction of and in the physical presence of a licensed physician. Because Dr. Coursey was not in the operating room or even at the hospital, they contend that Dr. Byrne, as the operating physician, was in charge of the operating room. Therefore, his failure to be present at the induction of anesthesia constituted a breach of the standard of care as well as a breach of the Standards of Practice for Nurse Anesthetists.

¶9. Two factors work against the Starchers in this regard. First, the Standards of Practice, upon which the Starchers so heavily rely, apply to CRNAs, not physicians. Although the Starchers insisted

that the Standards apply equally to CRNAs and physicians, absolutely no evidence is present in the record to show that the standards have any application to physicians. Second, with the exception of the Starcher's expert witness, no doctor called by either side stated that the physician must be physically present in the operating room at the induction of anesthesia. Every other doctor called stated unequivocally that the common practice was only that the surgeon must be in the operating suite. It was the general consensus of all doctors who testified, except for the Starcher's expert that the operating physician has a tendency to get in the way more than anything else when he or she is in the operating room at the induction of anesthesia. Further, C.L. Smith, CEO of Gulf Coast Regional Medical Center, testified that it is the hospital policy that the operating physician be within the operating suite, not the operating room at the induction of anesthesia.

¶10. There was adequate evidence that the CRNA could administer anesthesia where neither a surgeon nor an anesthesiologist is present in the operating room, that Mississippi CRNAs are indeed licensed to do so, and that this was a fairly common practice. In combination with the fact that Dr. Byrne was in the operating suite, and indeed helped to resuscitate Mrs. Starcher, this Court cannot say that a reasonable juror, taking the evidence in the light most favorable to the verdict, could not find for the defendant. As a result, this Court affirms the verdict of the jury as to this issue.

## II.

### WHETHER DR. BYRNE IS LIABLE AS A MATTER OF LAW UNDER THE BORROWED SERVANT RULE.

¶11. Diligent research has revealed no Mississippi cases holding that the nurse anesthetist, or any other nurse, for that matter is the borrowed servant of the operating surgeon during the course of surgery. However, recently in ***Quick Change Oil and Lube v. Rogers***, 663 So.2d 585 (Miss. 1995) this Court revisited the determining principles for determining the existence of a borrowed servant relationship, therein stating:

> The general rule as applied at common law, is that a servant, in general employment of one person, who is temporarily loaned to another person to do the latter's work, becomes, for the time being, the servant of the borrower, although he remains in the general employment of the lender. The borrower then becomes the employer to the exclusion of the lender. **Application of the rule depends upon the question of whose work is being performed, and if the lender is to escape liability, it must appear that the servant is under the borrower's exclusive control and direction as to the work in progress.** When an employee voluntarily accepts and enters upon such an assignment, he ceases to be in the course of the employment by the lender or the general employer. However, while the "loaned servant" doctrine is generally considered applicable in the compensation field, a shift of emphasis will be noted as to three pertinent questions involved, viz.: **(1)whose work is being performed, (2) who controls or has the right to control the workman as to the work being performed, and (3) has the workman voluntarily accepted the special employment.**

***Id.*** at 589 (*quoting* Dunn *, Mississippi Workers' Compensation Law §* 186 (1986)) (emphasis in original).

¶12. Thus, we are guided by three important factors in analyzing any employment relationship: (1)

whose work is being performed; (2) who has the right to control the worker in his duties on the job; and (3) the existence of an employment contract between the employee and the special employer whether actual or implied. *Quick Change* at 592.

¶13. The facts of this case adequately bear out that Dr. Byrne had no right of control over the actions of Nurse Wright. Wright was under no obligation to obey the orders of Dr. Byrne if Wright felt that those orders were wrong. Further, Wright was the general employee of Dr. Coursey and was paid by him. It was Wright's job to do what Dr. Coursey would do in Dr. Coursey's absence. Thus, in the course of a surgical procedure, Wright was the agent of Dr. Coursey. Such being the case, it cannot reasonably be stated that Wright is a borrowed servant if it could not be said that Coursey was the servant of Dr. Byrne. It would appear that in general, doctors are the general employees or the independent contractors of any hospital where they have staff privileges. Since they may have staff privileges at several hospitals at once, they are most likely independent contractors. But in any event, it cannot be said that one doctor is the employee of another in a surgical situation where each performs an independent function and bills the patient independent of the other. That being the case, Byrne had no right of control over the actions of Wright where he would have had no right of control over the actions of Dr. Coursey.

¶14. As to any special contract of employment which may have existed between Byrne and Wright, there is no evidence that one existed. Such a contract cannot even impliedly exist absent some showing that Wright was willing to submit himself to the direction and control of Byrne.

¶15. Because Wright was never under the direction and control of Dr. Byrne, and no special contract of employment existed between them, this Court holds that Nurse Wright was not the borrowed servant of Dr. Byrne and that Dr. Byrne cannot be held liable under the borrowed servant doctrine.

### III.

#### WHETHER DR. BYRNE IS LIABLE AS A MATTER OF LAW UNDER THE "CAPTAIN OF THE SHIP" DOCTRINE.

¶16. Other jurisdictions have held the surgeon liable for the negligent acts of others in the operating room under the "captain of the ship" doctrine. The theory behind this doctrine is that a surgeon has the ultimate responsibility for the care of the patient and has a nondelegable duty to ensure that proper care is given in all circumstances. The term was first created in *McConnell v. Williams,* 361 Pa. 355, 65 A.2d 243, 246 (1949) wherein the Pennsylvania Supreme Court stated that:

> . . . It can readily be understood that in the course of an operation in the operating room of a hospital, and until the surgeon leaves that room at the conclusion of the operation . . . he is in the same complete charge of those who are present and assisting him as is the captain of a ship over all on board, and that such supreme control is indeed essential in view of the high degree of protection to which an anesthetized, unconscious patient is entitled, . . .

*McConnell* addressed the question of whether a surgeon could be liable for the negligence of an intern who was employed by the hospital. The court found that the jury could conclude that the relationship between the intern and the surgeon was that of master and servant, and thus the surgeon could be held vicariously liable for any negligence on the part of the intern.

¶17. In *Leiker v. Gafford*, 778 P.2d 823 (Kan. 1989) [overruled in part on other grounds, *Martindale v. Tenny*, 829 P.2d 561 (Kan. 1992)] that court dealt with a statute requiring physicians to supervise the administration of anesthesia by nonphysicians. The surgeon was found liable by the jury because he had been in the doctors' lounge during the administration of an excessive dose of spinal anesthesia which caused the death of a patient.

¶18. We would point out that both *McConnell* and *Leiker* dealt with issues of fact concerning the surgeons liability which had first been decided in the favor of the plaintiffs in those cases by juries. The case at bar was also decided by a jury, but in the favor of the defendant. Secondly, in *McConnell*, the surgeon stated unequivocally at trial that he had absolute control over the negligent intern, and that the intern was bound to obey his orders, so that the jury was absolutely justified in finding the surgeon vicariously liable for the acts of the intern. In the case *sub judice*, it is undisputed that the surgeon did not have absolute control over the anesthesia process, so that the CRNA could legally be considered his borrowed servant.

¶19. Likewise, in *Leiker*, the issue of proper supervision was before the jury. The court instructed the jury that it was to consider the term "supervision" in the ordinary sense of the word. That jury decided as a matter of fact that the surgeon was negligent in failing to supervise the activities of the CRNA in that case. Secondly, such a holding by this Court would necessitate a finding that the actions of Wright were negligent. Since the actions of Wright are not at issue, it would not be proper for this Court to interject them. In the case *sub judice*, the jury determined to its satisfaction that the administration of the anesthesia had been adequately supervised. In keeping with the standard of review for jury verdicts, as stated *supra*, we will not second-guess the reasonable finding of the jury which is adequately supported by the record.

¶20. As to the "captain of the ship" doctrine, there may well be instances where the doctrine would be properly applicable, but this is not one of those instances. The Starchers wish this Court to decide as a matter of law issues which are in reality questions of fact, and were properly decided by a jury below. Therefore, we decline to adopt the "captain of the ship" doctrine in this case.

## IV.

### WHETHER THE TRIAL COURT ERRED IN FAILING TO GRANT PLAINTIFF'S JURY INSTRUCTIONS.

¶21. The Starchers can not prevail because this Court does not review jury instructions in isolation. Rather, instructions are read as a whole to determine if the jury was properly instructed. Accordingly, defects in specific instructions do not require reversal "where all instructions taken as a whole fairly--although not perfectly--announce the applicable primary rules of law." However, if those instructions do not fairly or adequately instruct the jury, this Court can and will reverse. *Lovett v. Bradford*, 676 So. 2d 893, 896-897 (Miss. 1996); *Peoples Bank and Trust Company v. Cermack*, 658 So. 2d 1352, 1356 (Miss. 1995).

¶22. The instructions complained of directed that the jury could consider whether or not the failure of Dr. Byrne to be physically present in the operating room was negligence, whether or not the failure of Dr. Byrne to adhere to the Standards of Practice for Nurse Anesthetists constituted negligence, and if the jury found negligence, to direct a verdict for Mrs. Starcher. The trial judge's reasoning for

refusing to grant this instruction was that it was his opinion that whether the Standards of Practice for Nurse Anesthetists created a minimum standard of care for the physician or not was a question for the jury. Therefore, instead of granting either P-16 or P-16-A, the judge gave instructions P-19 and P-34. Those instructions stated that the jury could properly consider whether the absence of Dr. Byrne from the operating room during the induction of anesthesia was negligence, and whether the failure to adhere to the Standards of Practice for Nurse Anesthetists was negligence. P-19 and P-34 further stated that if the jury found that either of these acts was negligence, the jury could properly consider whether that negligence was the cause of or contributed to the injuries of Mrs. Starcher. Given that the issues of supervision and adherence to the Standards of Practice for Nurse Anesthetists were jury questions, the giving of instructions P-19 and P-34 not only covered the same ground as P-16 and P-16-A, but they were better statements of the law. This issue is without merit.

## CONCLUSION

¶23. This Court affirms the verdict of the jury. Furthermore, we hold that the borrowed servant doctrine is not applicable in this case; that the "captain of the ship" doctrine is not well-suited to this case thus we decline to adopt the doctrine; and that the jury instructions given by the trial court fairly announced the applicable rules of law.

¶24. **JUDGMENT AFFIRMED**.

**LEE, C.J., PRATHER AND SULLIVAN, P.JJ., PITTMAN, BANKS, ROBERTS AND MILLS, JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**McRAE, JUSTICE, DISSENTING:**

¶25. Unlike the majority, I am not persuaded that the "captain of the ship" doctrine is inapplicable to the case *sub judice*. In most states, surgeons may be found liable for the failure to supervise a nurse-anesthetist or vicariously liable for a nurse-anesthetist's negligence. 8 Am. Jur. Proof of Facts 2d, *Surgeon's Failure to Exercise Supervision and Control over Anesthetist* § 1,6 (1976). Such liability is usually predicated upon the captain of the ship doctrine, consistent with the premise that "the obligation to provide anesthesia is not necessarily limited to one person." *McCullough v. Bethany Medical Center*, 235 Kan. 732, 737 683 P.2d 1258, 1262 (1984). That the surgeon is captain of the ship does not expose him to unfettered liability for the acts of all personnel in the operating room. Rather, at least one court has found that the "vital test" is whether the surgeon has the *right* to control the employee. *Harris v. Miller*, 103 N.C. App. 312, 322, 407 S.E.2d 556, 562 (1991). In the case *sub judice*, the issue of whether Dr. Byrne had the right to control Nurse Wright was a proper matter for the jury to consider.